UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| LAURA BLEVINS-CLARK, | ) | |
| Plaintiff, | ) | Case No. 5:22-cv-00281-KKC-MAS |
| v. | ) | **OPINION AND ORDER** |
| BEACON COMMUNITIES, *et al.*, | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on five cross-motions for summary judgment filed by the various Parties in this case, along with several other related motions. For the reasons that follow, Blevins-Clark's motion [R. 178] will be **DENIED**, and the motions filed by NIDC and Malvern [R. 191], and NDRCRI [R. 193] will be **GRANTED** in part and **DENIED** in part. The motion for summary judgment filed by Beacon Communities and Keystone Ventures [R. 194] will be **DENIED**. The motion for summary judgment filed by Beacon Companies and NDCREM [R. 195] will be **GRANTED**. Additionally, the Court will **DENY** NIDC and Malvern's Motion to Strike [R. 217], will **GRANT** Blevins-Clark's Motion for Disbursement of Funds [R. 187], and will **DENY** NIDC and Malvern's Motion for Injunctive Relief [R. 204].

# I

Plaintiff Laura Blevins-Clark is the daughter and sole heir of Ivan Blevins, a real estate developer who was a general partner in five partnerships ("the Kentucky

Partnerships") that are at the center of the present dispute[1]. Defendant NIDC Housing Corp. ("NIDC") was a limited partner in the Kentucky Partnerships. Malvern Service Corp. ("Malvern") was not directly involved in the Kentucky Partnerships but is an affiliate of NIDC.[2] Defendant NDC Realty Investments, Inc. ("NDCRI") was the managing general partner of the Kentucky Partnerships. Defendants Beacon Communities, LLC ("Beacon"), The Beacon Companies, Inc. ("Beacon Companies"), Keystone Values, LLC ("Keystone"), and NDC Real Estate Management LLC ("NDCREM") are also not partners in the Kentucky Partnerships but are affiliates of NDCRI.[3]

In the late 1970s and early 1980s, Ivan Blevins, alongside his business associate Harold Baldwin, entered into four limited partnerships[4] for the development and management of apartment complexes across Kentucky with Kaufman and Broad Housing Corp[5], investor limited partners known as K&B Housing Investors 1979-I and/or K&B Housing Investors 1979-III[6], and NDC Management Corp. Each of the partnerships were governed by substantively identical written agreements. NDCRI joined the partnerships as the managing general partner in 1992. Beacon acquired NDCRI in 2017. Importantly, Blevins and Baldwin were general partners in the partnerships, NDCRI served as the managing general partner, and NIDC, 1979-I, and 1979-III were limited partners.

---

[1] One partnership, Jackson Street Towers, Ltd., while the subject of this litigation, presents a different posture. NIDC is not a partner in this entity and thus does not assert a claim as to any sales proceeds related to the sale of this property. As of the time the motions were filed, Blevins-Clark and the Beacon Defendants had entered a tentative settlement agreement as to these funds, which is predicated on the occurrence of several conditions which have not transpired.

[2] Collectively, NIDC and Malvern are referred to as the "California Defendants" in much of the briefing on these cross-motions, as well as other documents in the record.

[3] NDCRI, Beacon, Beacon Companies, Keystone, and NDCREM are often referred to collectively in the briefing on these motions, and elsewhere in the record, as the "Beacon Defendants." However, the Court will refrain from employing that terminology here, unless the Court intends to refer to the five entities collectively. Rather, when only a single Beacon Defendant is at issue, the Court will refer to it directly.

[4] The four partnerships are Greater Corbin Manor, Ltd.; Madison Avenue Apartments Phase I, Ltd; Beattyville Manor Associates, Ltd.; and Campbellsville Manor Ltd.

[5] Kaufman and Broad Housing Corp. is the predecessor of NIDC.

[6] The record indicates that 1979-I was the investor limited partner in two of the partnerships, and 1979-III was the investor limited partner in the other two partnerships.

Ivan Blevins died in 2010, and Harold Baldwin died in 2019. On February 23, 2022, the Defendants entered the Purchase & Sale Agreement with Amity Companies, LLC, for the sale of the complexes. Around this time, the effect of Blevins' and Baldwin's deaths on the partnership became a point of contention between the Parties to this lawsuit. NIDC claimed entitlement to any sales profits attributable to the Blevins and Baldwin shares, while Ms. Blevins-Clark contended she was entitled to them as her father's heir. The Parties also disagreed as to whether NDCRI provided adequate notification to the partners regarding the death of Blevins and Baldwin.

Ultimately, Blevins-Clark filed her Complaint in this matter on October 21, 2022, alleging that the Defendants, acting collectively, were attempting to improperly sell the complexes and, subsequently, to deprive her of sales proceeds attributable to her late father's share. [See R. 1.] Some five weeks later, on November 28, 2022, the Court entered an agreed order among the parties which permitted the sale of the complexes and ordered the deposit of $701,382 of the proceeds into an escrow account. [See R. 15.] On September 5, 2024, the Court permitted NIDC to bring a number of cross-claims against the Beacon Defendants, which collectively allege misconduct on the part of NDCRI in addressing the partners' deaths, and seek to pierce the corporate veil. [See R. 72.] Now, following discovery, the various parties have moved for summary judgment. [R. 178; R. 191; R. 193; R. 194; R. 195.] These motions are now fully briefed and ripe for judicial review.

## II

Under Federal Rule of Civil Procedure, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The United States Supreme Court has consistently approved and encouraged the use of summary judgments to dispose of claims having no genuine factual issues. See e.g., *Celotex*, 477 U.S. 317.

Although a court must construe facts and draw reasonable inferences in the light most favorable to a non-movant, a non-movant must show sufficient evidence to create a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Klepper v. First Am. Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990) (citing *Celotex*, 477 U.S. at 322). To do so, the non-moving party must direct the Court's attention "to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

"If a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," entry of summary judgment is appropriate. *Id.* (citing *Celotex*, 477 U.S. at 322). The Court's role is to determine whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The standards upon which we evaluate motions for summary judgment do not change when, as here, 'both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment.'" *U.S. Bank, N.A. v. Cent. Bank & Trust Co.*, 2025 U.S. Dist. LEXIS 110458, at *4 (E.D. Ky. June 11, 2025) (quoting *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side of the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id*. (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

**III**

The Parties seek summary judgment as to all counts raised in both Blevins-Clark's Amended Complaint and NIDC's Crossclaim Complaint, with the exception of the Parties' equitable claims, on which only the relevant Defendants seek summary judgment. Consequently, a wide array of matters are before the Court. First, the Court will address the critical question of who is ultimately entitled to the disputed Blevins funds, a question that rests at the core of each of the Parties' arguments. Next, the Court will turn to Blevins-Clark's equitable claims. Then, the Court will turn to the remaining counts of NIDC and Malvern's crossclaims against the Beacon Defendants. The Court will next address NIDC's request to pierce the Beacon Defendants' corporate veil. Finally, the Court will address the two motions for injunctive relief also pending before the Court in light of their rulings on each of the foregoing issues.

**A**

The primary thrust of Blevins-Clark's complaint contends that the Defendants breached their contractual obligations – as stated in the partnership agreements – by refusing to immediately pay her the disputed Blevins share upon the sale of the complexes. [*See* R. 35 at 17-18.] Conversely, NIDC contends that it, not Blevins-Clark, is entitled to Ivan Blevins's share of partnership proceeds and that NDCRI likewise committed breach by withholding the sale proceeds attributable to the share. [*See* R. 73 at 21-22.] In other words, both Blevins-Clark and NIDC claim to be entitled to proceeds from the sale of the complexes owned by the Kentucky Partnerships attributable to Ivan Blevins's share. And both contend that, by withholding the disbursement of these proceeds, NDCRI has breached

the terms of the partnership agreements. It is readily apparent that both arguments cannot be true; only one of the two can be lawfully entitled to these funds. Resolving this question requires a close examination of the identical language across the four partnership agreements.

Under Kentucky law, a claim for breach of contract requires the complainant to demonstrate three things: "(1) the existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Taylor v. Univ. of the Cumberlands*, 2018 U.S. Dist. LEXIS 152513, at *12 (E.D. Ky. Sep. 7, 2018) (quoting *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)). Thus, "[t]o establish a breach of contract claim under Kentucky law, the plaintiff must show clear and convincing evidence that an agreement existed between the parties." *MidAmerican Distrib., Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646, 666-67 (E.D. Ky. 2011).

With respect to these elements, the Parties do not dispute the existence of a valid and enforceable contract embodied in the form of the partnership agreements, as amended. Nor do Blevins-Clark or NIDC dispute the existence of a breach[7]. NDCRI does not dispute that it has withheld the disbursement of profits attributable to the Blevins share, nor does it claim entitlement to the share itself. Nor do the Parties dispute the existence of damages; either Blevins-Clark or NIDC is entitled to profits attributable to the Blevins share. The central legal question, therefore, is to whom do the damages run?

At bottom, the breach damages run to the party who is entitled to receive the portion of the sale proceeds attributable to Blevins's partnership share. Blevins-Clark, NIDC, and NDCRI raise different theories as to how the partnership agreements should be interpreted and applied to answer this question. Several provisions of the partnership agreements, and

[7] NDCRI, on the other hand, argues that neither party can establish breach. This argument is addressed later in this opinion in Section III(C)(4).

the scope and effect of amendments thereto, are essential to this dispute. Section 6.03(b) provides that, "upon the … death … of a Person who is a General Partner, such Person shall immediately cease to act as a General Partner and his Interest shall be disposed of in accordance with the provisions of Section 7.18." [R. 191-37.] As relevant here where the death of a general partner has occurred, Section 7.18(c)(viii)(A) and (C) provided the applicable procedure. It states first that, "the executor of the estate … shall have the right to choose a successor General Partner, subject to compliance with Section 6.02," however, "if, within 60 days after such removal, the executor … fails to provide for the entry of an acceptable substitute General Partner, … then the provisions of Section 7.18(c)(i)-(vii) shall govern the disposition of the removed General Partner's Interest." [R. 191-38.] In turn, Section 7.18 provides that "the Partnership Interest of the removed General Partner shall be transferred, without payment of any consideration therefor, to [NIDC] or to any other Person named by [NIDC] to become the new General Partner in his place" and "the removed General Partner shall not be entitled to any return of his Capital Contribution." [*Id.*]

NIDC contends that, under these provisions, it became entitled to the economic value of Blevins's share of the partnership immediately on the sixty-first day following his death, because his estate did not seek the admission of a substitute partner within the requisite timeframe. [R. 191 at 7-8.] NIDC further argues that while subsequent amendments limited its ability to seek the removal and substitution of a living partner, none disturbed Section 7.18's provisions relating to the death of a general partner. [R. 192 at 4-5.] In further support of its argument, NIDC provides that it and the Beacon Defendants invoked, without objection, the death provisions in Sections 6.03(b) and 7.18 during the sale of Albany Manor in 2020. [R. 191 at 14-15.] The partnership agreement corresponding to the Albany Manor entity was materially identical to those in dispute here,

and involved the same partners, including both Blevins and Baldwin. [*Id.* at 14.] Consequently, NIDC posits that not only do the partnership agreements provide for its entitlement to the Blevins share, but the Parties here have also *applied* those provisions notwithstanding 2004 Amendment without objection.

Blevins-Clark acknowledges that the executor of her father's estate did not notify the partners of her father's death within 60 days thereafter, nor any time thereafter. She contends that she did not seek the formal admission of a substitute partner "because she never had copies of the partnership agreements, and was therefore unaware of the requirements of section 7.18(c)." [R. 178 at 5-6.] And, she effectively contends that she did not investigate further until this present controversy arose "because the Defendants always treated her as if she were a partner from the time of her father's death." [*Id.*]

Furthermore, in Blevins-Clark's view, NIDC forfeited any right it had to receive the Blevins share upon his death when it adopted a 2004 amendment to the Agreements. [R. 178 at 10-11.] The third paragraph of the 2004 Amendment provides, "

> [i]n addition, notwithstanding anything to the contrary contained in the Agreement or this Amendment, any special consent, approval, general partner and managing agent removal and nomination rights granted to NIDC by name in the Agreement shall be and hereby are deleted and NIDC shall no longer have such rights individually, except insofar as NIDC has such rights in its capacity as a Limited Partner under the terms of the Agreement.

[R. 191-52 at 2.] Because limited partners are not entitled to the "rights, benefits, and protections described in 6.03 and 7.18," Blevins-Clark argues that those provisions are rendered entirely null and void by the amendment. [R. 178 at 11.] Consequently, with those provisions nullified by amendment, Blevins-Clark provides that Ky. Rev. Stat. § 362.355 governs as a gap-filler and operates to render her entitled to the economic share of her father's partnership interest. [*Id.*]

NDCRI introduces a third argument into the mix. At the outset, NDCRI agrees with Blevins-Clark that the 2004 Amendment removed Section 7.18 in its entirety. [R. 193 at 13-16.] NDCRI likewise agrees that because the partnership is thus rendered silent as to what happens with the economic value of a general partner's interest upon death, Ky. Rev. Stat. § 362.355 answers that question in favor of Blevins-Clark. [*Id.* at 16.] ("In view of the foregoing points and authorities, it seems abundantly clear to NDCRI that the heirs of Blevins and Baldwin should ultimately receive whatever remaining profits are tied to the interests of those deceased general partners"). NDCRI goes further, however, and argues that if the Court were to find that Section 7.18 was not deleted in its entirety by the 2004 Amendment, the partnership agreements are ambiguous and must be submitted to a jury to resolve the discrepancy. [R. 193 at 17-19.]

**1**

The first essential question, therefore, is whether the 2004 amendment displaced all or part of NIDC's rights with respect to the Blevins share. "Unless a contract is ambiguous, a court must strictly construe the written document by its own terms in accordance with the words' ordinary meaning." *Gonzalez v. Lundy*, 2026 U.S. Dist. LEXIS 132302, at *8 (E.D. Ky. June 12, 2026) (citing *Frear v. P.T.A. Indus.*, 103 S.W.3d 99, 106 (Ky. 2003)); see also *Luttrell v. Cooper Indus., Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. Oct. 27, 1998) ("If the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.") (quoting *Taggart v. U.S.*, 880 F.2d 867, 870 (6th Cir. 1989)). A contract provision is unambiguous unless "a reasonable person would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)). "In interpreting a

partnership agreement, we look to the document as a whole." *G.P. Renflo, Inc. v. Renaissance by Lake Ivanhoe, Inc.*, 1995 U.S. App. LEXIS 35533, at *7 (6th Cir. Nov. 21, 1995) (citing *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195-96 (6th Cir. 1960)). Ultimately, however, "[t]he Court will not create an ambiguity where none exists." *Friction Materials Co., Inc. v. Stinson*, 833 S.W.2d 388 (Ky. Ct. App. 1992).

Additionally, "[t]he terms of an unambiguous contract cannot be varied by extrinsic evidence." *Luttrell*, 60 F. Supp. 2d at 631 (citing *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842 (Ky. 1968)). "Thus, a court may not consider parol evidence when interpreting a contract unless the contract is ambiguous." *Id.* (citing *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996)). Even so, the Court "is not required to read a contract in a vacuum," rather, "[a] contract is to be construed as a whole so as to ascertain and give effect to the true intent of the parties, and the circumstances under which the contract was executed and the conduct of the parties thereafter can be considered by the Court in determining what their intention was, without it becoming a violation of the parol evidence rule." *Id.* (quoting *Rudd-Melikian, Inc. v. Merritt*, 282 F.2d 924, 928 (6th Cir. 1960)).

Although the 2004 Amendment undoubtedly eliminated some of NIDC's powers in clear and unambiguous language, it did not stretch as far as Blevins-Clark or NDCRI posit. The 2004 Amendment purports to delete three specific, discrete powers held by NIDC under the terms of the partnership agreements: (1) special consent; (2) approval; (3) general partner and managing agent removal and nomination rights. The common thread underlying all of these powers is that they require some form of *action* on the part of NIDC: to grant special consent, to approve, to remove, and to nominate. Consequently, the 2004 Amendment certainly eliminated portions of 7.18(c) which grant NIDC the sole authority to

consent, approve, remove, or nominate a successor general partner, but it cannot eliminate the rights and privileges granted to NIDC therein which require *inaction*. Critically here, the provision in 7.18(c) which entitles NIDC to Blevins's partnership share does not require NIDC to take any action whatsoever in order to become so entitled. And because the relevant portion of 7.18(c) functions by virtue of NIDC's inaction – rather than its authority to consent, approve, remove, or nominate – it cannot have been deleted by the unambiguous language of the 2004 Amendment.

This conclusion is further supported by the fact that NIDC's rights invoked here under Section 7.18(c) – those which operate to automatically entitle them to the interest on the 61st day following the death of a general partner without requiring any affirmative action – is not a "removal right." Rather, NIDC's rights in this respect are more properly characterized as a right that *arises upon* removal. When a general partner dies, the death itself functions to remove the partner or his estate from the partnership's operation and effectively place his interest in abeyance. This is supported by the plain text of Section 6.03(b). [*See* R. 191-37.] ("such Person shall immediately cease to act as a General Partner and his interest shall be disposed of in accordance with the provisions of Section 7.18"). Insofar as any removal occurs it takes place automatically upon the partner's death, without any action on NIDC's part.

That being said, Blevins-Clark and NDCRI are partially correct in that the 2004 Amendment certainly curtailed the scope of NIDC's rights under Section 7.18. Relevant here, the Amendment unambiguously revoked NIDC's authority to nominate a successor general partner if the deceased partner's estate failed to do so itself within sixty days. The Amendment also undoubtedly deleted any removal authority NIDC held to oust a partner on any basis. These rights bear a key distinction from the one presently at issue: they require action on NIDC's part, either by virtue of a nomination or removal. Section

7.18(c)(i), however, requires NIDC to do *nothing whatsoever* in order to obtain NIDC's interest. Thus, while some parts of the 7.18 framework are clearly within the scope of the 2004 Amendment's plain language, the provisions that function to automatically entitle it to the interest are not.

Had the partners sought to delete Section 7.18 in its entirety, and by extension render moot any provisions which cross-reference 7.18, they could have done so explicitly. An amendment that reads "section 7.18 is deleted in its entirety" would have accomplished such a task. However, language of this sort is found nowhere in the amendment. Instead, the amendment provides for the deletion of three specific powers granted explicitly to NIDC by name in the agreements' original text. Nor does the 2004 Amendment provide replacement text to address the inevitable gap left behind by a complete elimination of section 7.18. It would seem squarely illogical for the partners to render the agreements entirely silent on fundamental, yet highly foreseeable, questions related to the disposition of a late partner's interest. In contrast, the clear language chosen by the partners in the 2004 Amendment evidence an intent to surgically modify the powers of NIDC to act within the partnership framework, rather than to eliminate entire provisions wholecloth or render the partnership agreements silent on key questions. This is especially true considering the questions at issue (i.e., the death of a general partner) are highly foreseeable to arise and require resolution during the life of the partnerships.

**2**

Additionally, the language present in the partnership agreements, as amended, is not ambiguous. In other words, there is no ambiguity with respect to the essential provisions which ultimately entitle NIDC to the disputed funds attributable to the Blevins share. Contrary to NDCRI's argument, the language in Section 6.03(b) does not render the Agreements ambiguous regarding the disposition of a deceased partner's interest. Section

6.03 provides that upon the death of a general partner:

> such Person shall immediately cease to act as a General Partner and his interest shall be disposed of in accordance with the provisions of Section 7.18, provided however, that such termination shall not affect the rights, obligations, or liabilities of the bankrupt, deceased, dissolved or incompetent General Partner which had matured prior to the bankruptcy, death, dissolution, or incompetence of such General Partner, or the value, if any, at the time of such bankruptcy, death, dissolution or incompetence of the Interest of the bankrupt, deceased, dissolved, or incompetent General Partner.

[R. 191-37 at 1.] NDCRI contends that this language essentially divests the financial component of the interest from its operational component at the time of the partner's death, thereby bestowing some additional right upon the deceased partner's estate to recover the value of the Interest, or to somehow extract future disbursements as the partnerships carry on. In turn, NDCRI further contends that this provision is in tension, if not directly contradictory to, the process laid out for disposing of a deceased general partner's interest in Section 7.18(c). Therefore, in NDCRI's view, notwithstanding the Court's interpretation of the scope of the 2004 Amendment, the amended Agreements are ambiguous as written, and such ambiguities must be addressed by a jury.

While the language of 6.03 certainly makes some distinction between the authority of a deceased partner's estate to act in the capacity of a general partner and the deceased partner's financial interest which arise upon his death, that distinction does not stretch as far as NDCRI contends, nor does it render the Agreements ambiguous. A line-by-line reading of Section 6.03(b) reveals its clear, unambiguous meaning and demonstrates the interrelationship between that provision and Section 7.18(c).

The first clause provides that upon the death of a general partner, "such Person shall immediately cease to act as a General Partner and his interest shall be disposed of in accordance with the provisions of Section 7.18." This language is unambiguous and

essential to the understanding of the remainder of 6.03(b). In practical effect, this language draws a clear distinction, a figurative "line in the sand," which arises upon the death of a general partner. Immediately upon such death, that person ceases to act in his capacity as a General Partner; in other words, the authority to act does not automatically vest with the deceased partner's estate or any other person. Instead, his interest is held in a state of abeyance until it is disposed of in accordance with Section 7.18. And, as already stated, Section 7.18(c) first permits the estate of the deceased general partner to nominate a successor general partner provided, however, that if the estate fails to nominate a suitable successor within sixty days following the partner's death, NIDC receives the interest automatically. The central purpose of this first clause, then, is to immediately freeze any present or future rights attributable to the deceased partner's interest, and provide for the future disposition of that interest.

The second operative clause begins, "provided, however," and lays out to caveats to the first clause upon which the partners sought to provide additional clarity. It continues, "such termination shall not affect the rights, obligations, or liabilities of the … deceased … General Partner which had matured prior to the … death … of such General Partner[.]" This language seeks to clarify the disposition of past "rights, obligations, or liabilities" which accrued prior to the death of the General Partner. In other words, those previously matured rights, obligations, or liabilities which existed at or before the date of death do not transfer alongside the partner's interest to either a nominated substitute general partner. For example, if the deceased partner owed a financial obligation to the partnership at the time of his death, neither the substitute partner nor NIDC would assume responsibility for that obligation upon transfer; it would remain with the estate. Conversely, the same would be true if the deceased partner had the right to receive a disbursement from the partnership, but did not receive it prior to his death. Again, this serves to further the

distinction between items associated with the interest arising entirely before the partner's death, and the nature of the interest which is transferred following his death.

The third, and final, clause of Section 6.03(b) also furthers this distinction. It provides that the deceased partner's termination shall also not affect "the value, if any, at the time of such … death … of the Interest of the … deceased … General Partner." This provision establishes the value of the interest at the date of death; it does not state that the estate of the deceased partner is entitled to receive that value. Rather, it provides that whoever received that interest – be it a substitute general partner nominated by Blevins's estate within sixty days, or NIDC – received it at that value which existed as of the date of death, not the value as of the date it was received. This squarely comports with the provisions of 7.18(c). Questions about whether the estate is entitled to receive compensation for the value of the interest or some other form of "buyout" are foreclosed by the clear language of Section 7.18(c)(i)-(ii) which provides that the interest shall be transferred, "without the payment of any consideration therefor" to NIDC and "the removed General Partner shall not be entitled to any return of his Capital Contribution." [See R. 191-38.] Thus, the third clause provides that the termination and disposition of the deceased partner's interest shall not affect its value; the recipient of the interest will take it at the value as it was the date the partner died.

Applying that framework here and beginning with the first clause, the disputed proceeds did not arise until the complexes were sold in 2022, some twelve years after the death of Blevins. Therefore, these proceeds cannot be said to have "matured prior to the" death of Blevins, the general partner, and therefore granting some right to the funds to his estate. This Court is also unaware of any additional rights, disbursements, or obligations which matured prior to Blevins's death for which he was not already compensated. As to the second clause, the value of his Interest was established at the time of his death, per

6.02(b)'s clear directive. Therefore, when NIDC received the Interest on the 61st day following Blevins's death, it received it at precisely that value which was established sixty-one days prior. That conclusion is required by the application of the unambiguous language set forth in the Agreements.

As an additional matter, NDCRI points out that the sole question before the Court is whether Blevins-Clark or NIDC is entitled to the proceeds attributable to the Blevins share, which came about following the sale of the complexes. [R. 211 at 16-17.] This is correct, but the answer to this question requires the Court, albeit tangentially, to examine the disposition of the entirety of the Blevins share following his death. In other words, while the Court will not enjoin the Partnerships, which are not named parties in this case, to substitute NIDC as a General Partner in Blevins's place, it must, at a minimum, reach the question of what occurred with Blevins's interest following his death. Therefore, while the Court agrees that no party in this litigation seeks injunctive relief requiring that they be admitted as a substitute general partner, and thus that question is not before it, it must indirectly determine who is entitled to that partnership interest to accord proper relief.

To summarize, the Agreements provided that upon the death of a general partner, the deceased partner's estate would be permitted sixty days by which they could nominate a substitute general partner. If that did not occur, NIDC could either itself nominate a successor general partner or, if it took no action, would assume the deceased general partner's interest. Although the 2004 Amendments deleted certain of NIDC's authorities under the Agreements, including its right to nominate a successor partner, it did not disturb the provision allowing NIDC to inherit the interest, which required no action on its part. Applying that framework here, because the estate of Ivan Blevins took no action within sixty days of his death to seek Blevins-Clark's substitution as a general partner in his place, his former interest transferred for no consideration to NIDC on the sixty-first

day. Any actions by NDCRI suggesting a different outcome are contrary to the plain language of the Agreements. NIDC, therefore, is entitled to the funds from the sale of the complexes attributable to Blevins's former interest in the Kentucky Partnerships. In turn, Blevins-Clark's breach of contract and anticipatory breach claims, in Counts One and Two of her Amended Complaint, fail as a matter of law.

**B**

Blevins-Clark also asserts two equitable claims against the Defendants, which were pleaded in the alternative. Taken together, these two claims essentially argue that notwithstanding the interpretation of the partnership agreements, the Defendants should be estopped from claiming that Blevins-Clark is not entitled to the proceeds attributable to her father's partnership share. Although the Plaintiff did not herself move for summary judgment on her equitable claims, the Defendants both contend that these claims fail as a matter of law. The Court agrees and will analyze each claim in turn.

**1**

"Under Kentucky law, equitable estoppel requires both a material misrepresentation by one party and reliance by the other party[.]" *Williams v. Hawkins*, 594 S.W.3d 189, 193 (Ky. 2020). The essential elements of equitable estoppel are:

> (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. And, broadly speaking, as related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Id*. (quoting *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 62 (Ky. 2010)). "Equitable estoppel is a defensive doctrine founded on the principles of fraud[.]" *Helm Co., LLC v. Al J. Schneider Co.*, 2014 Ky. App. Unpub. LEXIS 768, at *3 (Ky. Ct. App. Sep. 26, 2014) (quoting *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 594 (Ky. 2012)). It "may be invoked by an innocent party who has been fraudulently induced to change their position in reliance on an otherwise unenforceable oral agreement." As a result, "proving equitable estoppel is a heavy burden." *George & Co. v. Arch Coal*, 2021 U.S. Dist. LEXIS 40731 (E.D. Ky. Mar. 4, 2021) (citing *Id.*).

"Under the doctrine of equitable estoppel, certain conduct by a party is viewed as being so offensive that it precludes the party from later asserting a claim or defense that would otherwise be meritorious." *Akers v. Pike Cnty. Bd. of Educ.*, 171 S.W.3d 740, 743 (Ky. 2005). "In other words, it serves to offset the benefit that the offending party would otherwise derive from the conduct." *Id.* (citing *Edmonson v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 781 S.W.2d 743, 755 (Ky. 1989).

Both NDCRI and NIDC seek summary judgment with respect to Blevins-Clark's equitable estoppel claim. In support of its motion, NDCRI contends that under Kentucky law, equitable estoppel is viewed as a defensive doctrine, rather than a stand-alone claim. [R. 193 at 25.] Although Blevins-Clark agrees with NDCRI's observation, she contends that "it is not entirely clear from the caselaw that a party can never recover damages for an equitable estoppel claim as Beacon argues here." [R. 229 at 18.] In support of this statement, she cites to *PBI Bank, Inc. v. Signature Point Condominiums LLC*, in which the Kentucky Court of Appeals approved an award of punitive damages under a theory of promissory estoppel, writing, "[Plaintiff's] claim is more properly characterized as one of equitable estoppel. However, we decline to reverse based on a mere technicality in

terminology where it is apparent the jury was properly instructed as to the essential elements." 535 S.W.3d 700, 719 n. 13 (Ky. Ct. App. 2016). Therefore, Blevins-Clark opines that Kentucky courts have at times contemplated an award of monetary damages for an equitable estoppel claim.

The Court agrees with NDCRI's characterization of equitable estoppel under Kentucky law. As this Court recently stated, "estoppel always acts as a shield, never as a sword" and, thus, "equitable estoppel is not a claim, but 'a means of precluding the assertion of a claim or a defense." *Jeffery v. Medical Protective Co.*, 446 F. Supp. 3d 177, 183 (E.D. Ky. Mar. 13, 2020) (citing 28 Am. Jur. 2d Operation and Effect § 30). In *Jeffery*, the plaintiff pleaded equitable estoppel as a standalone claim, seeking to estop the defendant from asserting lack of notice as a defense to her indemnity claim. The Court held that while the plaintiff could argue, under a theory of equitable estoppel, that the defendant should be prevented from litigating the notice question, "that argument need not be asserted as a claim, and is not a basis for relief as used here." *Id.* It thus dismissed the equitable estoppel claim.

Here, Blevins-Clark seeks to take equitable estoppel even further by asserting it as an independent claim for which she should be awarded monetary damages regardless of whether the Court finds her entitled to the disputed funds under the language of the Agreements. This represents a clearly offensive usage of the defensive doctrine, which cannot stand under Kentucky law. The fact that the Kentucky Court of Appeals observed, in a footnote no less, that a promissory estoppel claim should likely have been characterized as equitable estoppel is of no consequence. Ultimately, the *PBI Bank* case involved a promissory estoppel claim, which can occasionally be brought as a standalone claim under Kentucky law. What is clear is that Kentucky courts restrict equitable estoppel to defensive uses. See *Ping v. Beverly Enters. Inc.*, 376 S.W.3d 581, 594-95 (Ky. 2012)

(recognizing equitable estoppel as a "defensive doctrine founded on the principles of fraud"); *Wadley v. Nat'l Railway Equip. Co.*, 572 F. Supp. 3d 361, 375 (W.D. Ky. 2021) (holding that equitable estoppel cannot form a separate claim for damages); *Bell v. Kokosing Industrial, Inc.*, 2020 WL 4210701, at *15 n.18 (E.D. Ky. July 22, 2020) ("[T]he [plaintiffs'] argument that equitable estoppel is an affirmative action in addition to a defensive action lacks support"). Insofar as Blevins-Clark seeks to assert an equitable estoppel claim in an offensive manner (i.e., an independent basis for monetary relief), be it against NDCRI or NIDC, such a claim is improper under Kentucky law.

Regardless, Blevins-Clark further contends that even if the Court concludes that equitable estoppel can be used only in a defensive manner, it should still permit her to estop the Beacon Defendants from asserting certain arguments at trial. [*See* R. 229 at 19.] If this case were to proceed to trial, it is plausible that equitable estoppel could be employed to estop Beacon from making certain arguments. This would comport with the defensive usage requirement for equitable estoppel claim, and mirror its typical usage in Kentucky courts. See *Derby City Cap., LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 732 (W.D. Ky. 2013) ("[E]quitable estoppel is typically asserted to bar a party from raising a defense or from taking certain action."). None of Blevins-Clark's claims will be proceeding to trial, however, because the unambiguous language of the Agreements entitles NIDC to the disputed funds attributable to the former Blevins interest. Consequently, there is no venue in which Blevins-Clark would be able to employ equitable estoppel, and as already stated, it cannot exist as a stand-alone cause of action. As a result, all Defendants are entitled to summary judgment on this claim.

**2**

Unjust enrichment was created "as a basis of restitution to prevent one person from keeping money or benefits belonging to another." *Rose v. Ackerson*, 374 S.W.3d 339, 343

(Ky. Ct. App. 2012) (quoting *Haeberle v. St. Paul Fire and Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989)). Under Kentucky law, the party claiming unjust enrichment must demonstrate: "(1) benefit conferred upon defendant at plaintiff's expense, (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Collins v. Kentucky Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. Ct. App. 2012).

Blevins-Clark's unjust enrichment claim ultimately fails, as to both NDCRI and NIDC, because such a claim requires the defendant to "keep money or benefits belonging to another." See *Rose*, 374 S.W.3d at 343. Ultimately, Blevins-Clark cannot make such a showing because, as already stated, she has no entitlement to disputed funds attributable to the Blevins share. It is these disputed funds that form the basis of the unjust enrichment claim. Consequently, both NDCRI and NIDC are entitled to judgment as a matter of law as to the fourth, and final remaining count of Blevins-Clark's Amended Complaint.

**C**

The Court next turns to the merits of NIDC's cross-claim against the Beacon Defendants. In this cross-claim, NIDC and Malvern assert a variety of claims, some of which are pleaded in the alternative, against Beacon which collectively contend that NIDC is entitled to the disputed funds attributable to both the Blevins and Baldwin shares, that NDCRI additionally breached the Agreements through its management of partnership affairs and assets, and also seeks to pierce the corporate veil of the Beacon entities. [See R. 73.] One of these claims is hampered by material factual disputes and will require further adjudication before the factfinder. Others, however, invoke separate portions of the Agreements and are thus evaluated entirely independently, and ultimately amount to questions of law. At any rate, both NIDC and Beacon have moved for summary judgment

as to all claims. The Court will address each claim in turn.

**1**

NIDC also claims it is entitled to the funds attributable to the Baldwin interest, for the same reasons it is entitled to the Blevins share funds. The same provisions which apply to the disposition of the Blevins interest apply with equal force to the Baldwin share, and the factual circumstances of both are materially identical. The record indicates that Harold Baldwin died in 2019, and that no action was taken by his estate to seek the admission of an acceptable substitute partner within sixty days of his death. Unique to the Baldwin share, however, is the absence of any representative of the Baldwin estate, or any potential Baldwin heir, in this litigation. NDCRI contends that any action with respect to Baldwin in the absence of such parties would be improper, because they represent necessary and indispensable parties under Rule 19.

To determine whether a person is an indispensable party under Rule 19, the Court must apply a three-step analysis. *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993); *Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 666 (6th Cir. 2004). Under the first step, the Court "determine[s] whether a person is necessary to the action and should be joined if possible." *Keweenaw Bay*, 11 F.3d at 1345; *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 763-64 (6th Cir. 1999). To make this determination, Rule 19(a) provides:

> (A) in that person's absence, the court cannot afford complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). "If the court determines that the person or entity does not fall within one of these provisions, joinder, as well as further analysis, is unnecessary." *Local 670, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO,* 822 F.2d 613, 618 (6th Cir. 1987).

NDCRI's argument misses the point, however. As NDCRI itself states, what is in dispute is who is entitled to the proceeds from the sale of the apartment complexes attributable to Baldwin's share. [*See* R. 15] ("[a]ny further litigation in this case SHALL center upon this proper disposition of proceeds from the sale of apartment complexes to those former interests.") As already set forth above, the answer to this question requires the Court to at least pass indirectly on the question of what occurred to the entirety of Baldwin's partnership interest following his death. In some respects, the two questions are inextricably linked. Thus, while the Court does not squarely address the issue of general partner substitution, it must indirectly address the question to resolve the question that is undeniably before the Court: whether NDCRI breached the partnership agreements by failing to award the proceeds attributable to the Baldwin partnership share to NIDC.

The Court can reach this question without the joinder of the Baldwin estate, or any of the other partners, to this lawsuit. As NIDC effectively points out, NDCRI's argument overextends the relief sought by NIDC in its crossclaim, which would require the joinder of additional parties. By its own admission, "NIDC has never sought to become a substitute general partner, least of all in its Crossclaim. There would be no reason to. Sections 6.03(b) and 7.18(c) required transfer of the Blevins and Baldwin interests to NIDC without some theoretical 'substitution' of NIDC – an existing partner in the partnerships since 1979 – for a deceased partner." [R. 219 at 7-8.] As the Court explained above, the Agreements

operated to automatically transfer the entirety of a deceased partner's interest to NIDC on the sixty-first day following their death, less any rights or obligations with matured prior to his death, so long as the deceased partner's estate did not take action to nominate an acceptable substitute general partner. Thus, a determination that NIDC is entitled to the disputed funds attributable to either the Blevins or Baldwin share does not require injunctive relief ordering that NIDC be rendered a substitute partner. This is because NIDC is, and always has been, a partner in the partnerships; the Agreements' provisions regarding the disposition of a deceased partner's interest merely increase the size of their existing interest. In other words, a court-mandated substitution is not needed; such a substitution already occurred, automatically, upon the sixty-first day following the death of Blevins and Baldwin, when their estates failed to take action to seek a substitution.

The cases cited by NDCRI involve materially different circumstances from those presently at bar. For example, the case of *Schmidt v. E.N. Maisel & Assocs.* involved an individual partner bringing suit against the partnership to seek injunctive relief, rather than monetary damages, and the requested relief would have affected the rights or obligations of the remaining partners. 105 F.R.D. 157, 160 (N.D. Ill. 1985). Here, NIDC seeks no such relief, and merely seeks money damages as to disputed funds attributable to a partnership interest it alone is entitled to. The cases of *Grant County Deposit Bank v. McCampbell* and *Smith v. Smith, Barney, Harris, Upham & Co.* are likewise readily distinguishable. There, individual partners brought suit on behalf of the partnership entity against third parties with whom the partnerships had conducted business. The Court held that the remaining partners were necessary and indispensable parties because the claim arose out of a partnership transaction. See *Grant Cnty. Deposit Bank*, 194 F.2d at 471-72 ("a partner has an interest in a partnership account arising out of a partnership transaction"); *Smith*, 505 F. Supp. at 1383 (holding that other partners are "necessary and

indispensable parties to any action brought to enforce any claim of the partnership"). Here, the dispute at the root of NIDC's crossclaim is a dispute entirely internal to the partnership and among its own partners. It does not involve a suit on behalf of the partnership against third parties, as the *Smith* and *Grant* cases did.

The case of *Hooper v. Wolfe*, which is also cited by NDCRI, is particularly insightful, not only because it comes from our circuit, but also because of its closer conceptual similarity to the case at bar. *See* 396 F.3d 744, 749 (6th Cir. 2005). In that case, the plaintiff, who was not a partner in the partnership, brought suit against the managing general partner regarding a dispute over an asset owned by the partnership. The plaintiff did not name the partnership as a defendant. In holding that the partnership itself was not an indispensable party under Rule 19, the Court stated

> When assessing prejudice, the court must consider whether the interests of an absent party are adequately represented by those already a party to the litigation. Here, [the partnership]'s general partner, PPM, Inc., and PPM, Inc.'s sole shareholder, Mr. Wolfe, are before the court as defendants. Only the general partner may act on behalf of [the partnership], and the … defendants make no argument that the interests of [the partnership] are sufficiently distinct from those of PPM, Inc. and Mr. Wolfe, such that [the partnership] will not be adequately represented in the litigation.
>
> …
>
> [The partnership] is not a human being and its interests can only be known through the medium of the general partner, PPM, Inc., and its human master Mr. Wolfe, who are both before the court. Therefore, the ability of PPM, Inc. and Mr. Wolfe to represent [the partnership] adequately militates against finding [the partnership] to be an indispensable party.

*Id*. at 749-50. To paraphrase, the Court held that the partnership entity was not a necessary and indispensable party to the suit, because its interests were adequately represented by the general partner and the general partner's sole shareholder, who were both named defendants.

Here, the Baldwin estate or any of Baldwin's heirs, are not a necessary and

indispensable party to this litigation because, at bottom, they are not partners and have no viable claim of entitlement to any of the disputed proceeds. And the partnership entities are not themselves necessary and indispensable, under the framework set forth in *Hooper*, because all of the partners are either named parties, or are directly managed by named parties who adequately represent their interests.[8] Just as the general partner and its sole shareholder were sufficient to represent the partnership in *Hooper*, so too can NDCRI and its Beacon Defendant owners in the partnerships presently at issue.

**2**

Counts Eleven, Twelve, and Thirteen assert three claims for conversion pleaded in the alternative to several of the breach of contract claims. [R. 73 at 25-26.] Count Eleven asserts a claim for conversion against the Beacon Defendants, contending they are being unlawfully denied the use and enjoyment of the disputed Baldwin funds to which they claim lawful entitlement. Count Twelve alleges the same, but with respect to the reserves of sale proceeds for the purpose of paying legal expenses incurred in conjunction with this litigation, to which they claim to be lawfully entitled. Count Thirteen alleges the same but with respect to the withheld funds to pay for final payables, representations, and warranties.

"Under Kentucky law, '[a]lthough a breach of contract action and a claim for conversion are not necessarily incompatible,' a conversion claim does not lie where 'the property right alleged to have been converted arises entirely from the contractual rights to compensation." *Evans v. Novolex Holdings, LLC*, 2021 U.S. Dist. LEXIS 101538, at *19-20 (E.D. Ky. May 28, 2021) (citing *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 853-54

[8] More specifically, the managing general partner, NDCRI is a named party, alongside the various other Beacon Defendants. The other partners who are not named parties are NDC Management LLC, which is wholly owned by Keystone, which is a named party. Additionally, the investor limited partners, 1979-I and 1979-III, are not named parties but are directly managed by NIDC, and are therefore adequately represented.

(Ky. Ct. App. 2014); *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005)). In *Davis*, as here, the plaintiff (or, here, the crossclaim plaintiff) pleaded breach of contract and conversion claims in the alternative for failure to pay the plaintiff under a contractual agreement. The *Davis* Court "opined that because the plaintiff's claim was based on 'payment of a disputed debt, not payment for the conversion of a specific asset or specific property right … [t]he interpretation of the contract governs [plaintiff's] entitlement to the disputed payments." *Novolex Holdings*, 2021 U.S. Dist. LEXIS 101538, at *20 (citing *Davis*, 399 F. Supp. 2d at 801).

In the present case, because the underlying basis for the conversion claims asserted by NIDC arise solely from NDCRI's failure to pay it, as a limited partner, for funds it purports to be entitled to under the Agreements, it does not have an independently actionable conversion claim. See *Novolex Holdings*, 2021 U.S. Dist. LEXIS 101538, at *20 ("Because the underlying basis for Plaintiff's conversion claim is Defendants' failure to pay Plaintiff funds allegedly owed to him under the [agreement], Plaintiff does not have an actionable conversion claim"); see also *Bus. Payment Sys., LLC v. Nat'l Processing Co.*, 2012 U.S. Dist. LEXIS 171810, at *17 (W.D. Ky. Dec. 3, 2012) (reaching the same conclusion in reliance on *Davis*). In other words, the conversion claim fails because the "property right" at issue arises entirely from the contractual rights set forth in the partnership agreements. Consequently, the terms of the Agreement will govern the claim, and NDCRI is entitled to judgment as a matter of law with respect to Counts Eleven, Twelve, and Thirteen.

**3**

Many of the remaining claims pleaded in NIDC's crossclaim are rendered moot by the Court's ultimate grant of summary judgment for the Defendants as to all of Blevins-Clark's claims. Count One asserts a claim for breach of contract against Beacon, premised

on Beacon's purported failure to notify NIDC of Blevins's death for approximately twelve years, even though they knew, or reasonably should have known, of his death. Count Two asserts another breach claim, which alleges that Beacon was contractually required to follow the process contained in the Agreements for admitting a successor general partner, but instead "ignored that process yet still viewed Plaintiff as a successor partner anyway and sent her partnership tax documents as if she were a partner for 12 years." Count Three pleads a statutory claim, alleging that Beacon violated the Kentucky Limited Partnership Act by failing to follow the admission procedures set forth in the Agreement or, alternatively, the procedure prescribed by state law. Count Nine asserts a common law negligence claim against Beacon, alleging that even if Beacon did not actually know it was acting in violation of the Agreements in its treatment of Blevins-Clark, "they should have known as much and owed a duty to NIDC to do so." Count Ten asserts a claim for breach of fiduciary duty premised on the same alleged conduct. Finally, Count Fourteen asserts a claim for indemnification, claiming that "[a]ny liability of NIDC or Malvern that results from this litigation, as well as the need for NIDC and Malvern's reasonable costs and attorney fees related to this litigation, are due solely to the actions of the Beacon Defendants."

These claims are rendered moot because the existence of any injury-in-fact was contingent upon a finding that Blevins-Clark is entitled to the disputed funds, and the imposition of joint and several liability upon NIDC and the Beacon Defendants. Each of the claims includes language stating that the specific action at issue injured NIDC "by having to defend themselves in this litigation and exposing them to potential liability that could arise from this litigation." [See R. 73 at 19-26.] This effectively asserts two categories of injury: potential financial liability which could arise if plaintiff succeeds on her claim, and litigation costs. For the reasons already stated, the Defendants are entitled to judgment as

a matter of law regarding the entirety of Blevins-Clark's complaint. Consequently, NIDC and Malvern will not face any financial liability in conjunction with this suit, other than costs incurred in defending this litigation.

These litigation costs alone are insufficient to establish standing. "[W]hen evaluating a counterclaim, 'standing must be established independent of the lawsuit filed by the plaintiff.'" *J.S.T. Corp. v. Robert Bosch LLC*, 2019 WL 78896, at *3 (E.D. Mich. Jan. 2, 2019) (citing *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 (9th Cir. 2001)). "Litigation costs are insufficient to establish standing for the purposes of Article III." *San Diego Unified Port Dist. v. Monsanto Co.*, 309 F. Supp. 3d 854, 861 (S.D. Cal. 2018). NIDC's reasoning for pleading these additional claims is clear, as it sought to pass any joint and several liability imposed onto its co-defendants. Had the Defendants not been entitled to summary judgment as to all of Blevins-Clark's remaining claims, these claims would likely have survived. Yet, in the absence of any concrete injury, other than incurring litigation costs to defend plaintiff's complaint, NIDC and Malvern lack standing to assert these claims, regardless of any misconduct on Beacon's part. Consequently, the Court will not reach the merits of these claims because, absent any viable injury, NIDC and Malvern lack standing to assert them, and will dismiss them.

**4**

In its motion for summary judgment, NDCRI claims that it cannot be held liable on any theory for its failure to immediately turn over the disputed funds – either on a breach of contract theory or any other – because it sought to comply with the Court's prior orders regarding this case, and because it was necessary to chart a neutral course in the entitlement dispute between Blevins-Clark and NIDC. [R. 193 at 8-12.] NIDC, on the other hand, argues that NDCRI was obligated to pick a "winner" and immediately distribute the disputed profits in accordance with its interpretation. [R. 233 at 10-11.] This points to a

central question that underlies the aforementioned dispute over contract interpretation – did NDCRI "breach" the Agreements by failing to hand over the disputed funds to either Blevins-Clark or NIDC?

In NDCRI's view, this question is primarily one of timing. NDCRI points out that the disputed profits at issue did not exist at the time this litigation commenced in October 2022 and did not arise until February 2023 when the complexes were sold to Amity. Before the time of the sale, NDCRI argues that it cannot be held liable for failing to distribute profits to either Blevins-Clark or NIDC because those profits did not yet exist. And, following the sale of the complexes, NDCRI posits that it cannot be said to have "breached" the Agreements by failing to distribute the disputed profits because the Court ordered those funds to be placed in escrow. To do so, in NDCRI's view, would have required it to violate an order of this Court.

NDCRI further posits that regardless of whether it was required to escrow the disputed funds, it was obligated to chart a neutral court in its role as managing general partner. In this respect, NDCRI states that it "cannot be faulted, or held liable in contract or tort, for taking this position that the dispute between Plaintiff and the NIDC Co-Defendants should be 'resolved by agreement or Court order." "To hold otherwise[,]" in NDCRI's view, "would put any fiduciary in the untenable position of having to try and arbitrate disputes between feuding partners or beneficiaries, only to be later hauled into court by one side or the other."

NIDC, on the other hand, argues a different conclusion is forced by a reading of the plain terms in the Agreement. In its view, NDCRI was immediately required to "pick a winner" under Section 6.03(c) of the Agreements, which provides:

> If, at the time of the … death … of a General Partner, the …deceased … General Partner was not the sole General Partner of the Partnership, the

> remaining General Partner or General Partners … shall immediately … make such amendments of this Agreement and execute and file for recordation such Certificate or other instruments as are necessary to reflect the disposition of the Interest of the … deceased … General Partner and such … deceased … General Partner's having ceased to be a General Partner.

Additionally, Section 6.03(c) also provides that "[a]ll Partners shall give, and hereby do give, such Consents, shall take such actions, and execute such documents as shall be legally necessary and sufficient to effect such disposition …" Where a modification in the governing documents was required, such as the disposition of a deceased partner's interest under 7.18(c), the following section, 7.18(d) provides that "[a]ll Partners … shall take such actions, and shall execute such documents as shall be legally necessary and sufficient to effect all of the foregoing provisions of this section[.]"

Based on its interpretation of these provisions, NIDC's argument also amounts to one about timing. It contends that the proper time in which NDCRI had to "pick a winner" was not in 2022 when this litigation began, or in 2023 when the complexes were sold, but rather when Blevins and Baldwin died in 2010 and 2019, respectively. In other words, NIDC essentially posits that NDCRI breached Section 6.03(c) of the Agreements in 2010 and 2019, and those breaches are directly linked to, if not the sole cause of, their purported breach in 2023.

NDCRI is right on one key point: Kentucky law certainly discourages fiduciaries from picking sides in a dispute between stakeholders and cautions that neutrality is a sounder path. In the present case, however, NDCRI was required to "pick a winner" long before there was a live dispute in which they should remain neutral. And by failing to interpret the Agreements and "immediately" effectuate amendments and modification to the partnerships' governing documents, NDCRI violated Section 6.03(c) and, thus, committed breach of contract. In other words, while NDCRI had an obligation to remain

neutral once a conflict arises between limited partners, no such conflict existed when NDCRI should have acted, which was sixty days following Blevins's and Baldwin's deaths in 2010 and 2019, respectively.

From this, the Court can conclude that NDCRI breached the contract, and that as a result of the breach, NIDC suffered damages equal to the amount of the disputed partnership profits attributable to the Blevins and Baldwin shares. Again, NDCRI's breach is not their failure to distribute the disputed profits once this litigation began, but rather their failure to "immediately" amend the partnerships' governing documents, as required by Section 6.03(c). Because of this breach, the Agreements did not reflect the disposition of the former Blevins and Baldwin shares at the time the complexes were ultimately sold. And, because the Agreements were unamended, the distribution of these profits was unclear as the sale unfolded rapidly. In turn, NIDC was not given the disputed funds, despite being entitled to receive them, and instead this lawsuit resulted. Consequently, NDCRI "breached" the Agreements back in 2010 and again in 2019, while the resulting damages did not accrue until the sale of the complexes in 2022. All of the requisite elements of Counts Four and Five being satisfied, and in the absence of a material dispute of fact, the Court finds that NIDC and Malvern are entitled to summary judgment on these counts.[9]

**5**

NIDC also contends that NDCRI continues to wrongfully withhold certain funds to cover its own legal expenses incurred in conjunction with this litigation. [R. 191 at 21-22.] On the other hand, NDCRI contends that, under the terms of the Agreements, it is entitled to indemnification from partnership funds for its legal fees in the present case. [R. 193 at 19-22.] Section 7.26 of the Agreements provides, in full, as follows:

---

[9] This, in turn, moots Count Six of the Crossclaim Complaint, which seeks equitable estoppel on the same basis. [R. 73 at 22-23.]

> The Partnership shall indemnify each General Partner against any claim or liability incurred in connection with the business of the Partnership except for gross negligence, willful misconduct, or breach of fiduciary duty.
>
> The General Partners shall not be liable, responsible or accountable in damages or otherwise to any of the Partners for any act or omission performed or omitted by them in good faith on behalf of the Partnership and in a manner reasonably believed by them to be within the scope of the authority granted to them by this Agreement and in the best interest of the Partnership, except for gross negligence, willful misconduct or any breach of their fiduciary duty with respect to such acts or omissions.

[*See* R. 181, Ex. 54.]

NIDC contends that, "Beacon's failures and refusals to apply the partnership agreements following the deaths of Blevins and Baldwin were not 'the business of the Partnership' and were not 'reasonable[,]'" and instead constituted "gross negligence, willful misconduct, or breach of fiduciary duty." [R. 233 at 17.] Beyond NIDC's characterization of Beacon's litigation position in this matter, it also notes that its argument is really a question of timing. It contends that even if NDCRI was entitled to indemnification from the partnerships for legal fees incurred in connection with this matter, they are not entitled to withdraw these funds from the partnership's account until after the litigation concludes. [*Id.*]

NDCRI, on the other hand, contends that it is acting under "a reasonable, good faith belief that NIDC is not entitled to the funds it seeks under those [partnership] Agreements[,]" and is therefore entitled to indemnification under the terms of Section 7.26. [R. 193 at 21.] Therefore, NDCRI argues that "[h]ere, the partners each have an obligation to indemnify NDCRI as the neutral, managing general partner, who has been hailed into this litigation despite making no claim to the disputed funds." [*Id.*]

Regardless of whether NDCRI's actions with respect to the management of the partnership are actionable, the Court agrees first with NIDC's timing argument. NDCRI is

not permitted to indemnification for legal fees incurred in connection with its role as the managing general partner pursuant to Section 7.26 while that litigation remains ongoing. The reasoning for this is relatively straightforward. Permitting NDCRI to indemnify itself as the litigation continued allows it to decide whether its own conduct amounts to "gross negligence, willful misconduct, or a breach of fiduciary duty." In other words, if NDCRI could decide this question for itself in the middle of litigation, it would practically remove all objectivity from the determination. Under NDCRI's reading of Section 7.26, it alone would have sole control in determining whether its own actions placed it outside the scope of the indemnity provision, a conclusion it would, frankly, be unlikely to reach. Thus, even where a partner may be entitled to indemnification from the partnership, the partner cannot simply periodically withdraw those funds from the partnership's coffers as the litigation continues. That is especially true where, as here, there is a question as to whether the partner seeking indemnification acted with gross negligence, willful disregard, or in violation of their fiduciary duties.

This conclusion is actually supported by the cases cited by Beacon. In *Swyers v. Allen Family Partnership #1, LLC*, the Kentucky Supreme Court affirmed the trial court's award of attorneys' fees to the partner centrally responsible for the disbursement of funds from the sale of commercial real estate. 694 S.W.3d 257 (Ky. 2024). In that case, however, the indemnification in question did not occur until the conclusion of the litigation, and only once the partner had been cleared of wrongdoing. More specifically, the partner sought indemnification through a counterclaim, alongside an additional claim contending that he "properly made the distributions pursuant to the terms of [the agreement]." *Id.* at 262. NDCRI's reliance on *Swyers* improperly conflates NIDC's timing argument with the question of whether NDCRI would *ever* be entitled to indemnification. Although the responsible partner in *Swyers* was ultimately indemnified by the trial court's order, he was

not reimbursed for the legal fees incurred until the end of the litigation. There was no evidence that the partner in *Swyers* indemnified himself from the partnership's coffers as the litigation progressed and before he was cleared of wrongdoing. Here, not only is NDCRI's alleged wrongdoing still at issue, but Section 7.26 explicitly provides that a general partner is entitled to indemnification unless they acted with gross negligence, willful misconduct, or in violation of their fiduciary duties. Because NDCRI had no objective basis to make such a conclusion when it withdrew partnership funds to cover its legal expenses, it acted prematurely in view of Section 7.26.

NDCRI asserts, incorrectly, that "[i]f this Court were to agree with Co-Defendants assertion that by merely alleging breach of fiduciary duty, gross negligence, and misconduct any party could be deprived of its contractual indemnification rights, indemnification provisions throughout the Commonwealth would become meaningless if mere allegations in a complaint could overcome the contractual right." [R. 211 at 27.] Again, this misconstrues the argument. The Court does not hold that the right to indemnification is permanently extinguished by the mere allegations of wrongdoing contained in a complaint. Rather, the right to indemnification cannot be readily ascertained until questions about such misconduct are considered and resolved. Once the party seeking indemnification overcomes those allegations, it will be entitled to reimbursement at that time. If they cannot overcome those allegations, they would not have been entitled to indemnification in the first place.

This debate as to the timing of the indemnification will ultimately be resolved once the question of entitlement to indemnification *at all* is resolved. In other words, determining whether NDCRI was entitled to indemnification at any time will necessarily moot the question as to whether the specific timing was appropriate. If NDCRI is entitled to indemnification for its legal fees, it will have already withdrawn at least a sizeable

portion of those, and no injury would have resulted from the premature withdrawal.[10] If NDCRI is ultimately not entitled to indemnification for their legal fees, they will ultimately be required to return these funds to the partnership coffers from which they came. It would seem pointless in the broader sense to require NDCRI to replace the funds at this time. In the end, it will either be entitled to keep these funds, or will be obligated to return them, once the merits of Count VII are reached.

Based upon the evidence before it, the Court cannot find that either NIDC or NDCRI are entitled to summary judgment on Count VII, because of the existence of a genuine dispute of material facts. Ultimately, the question of entitlement to indemnification turns on whether NDCRI breached their fiduciary duties to the partnerships and their respective partners, and/or whether NDCRI acted with gross negligence in the performance of their partnership duties. These are legally operative terms with clearly defined legal standards under Kentucky law. Under the plain language of Section 7.26, NDCRI "*shall*" be entitled to indemnification for legal fees *unless* they acted contrary to their fiduciary duties or with gross negligence. This contemplates that indemnification is the norm, unless an injured partner can demonstrate a violation. Thus, the partner seeking to prevent such indemnification bears the burden of proof under this framework.

"To state a claim for breach of fiduciary duty under Kentucky law, plaintiff must establish that the defendant owed a fiduciary duty, breached that duty, and that the breach caused damages." *Ivan Ware & Son, Inc. v. Delta Aliraq, Inc.*, 2016 U.S. Dist. LEXIS 28356 at *5 (W.D. Ky. Mar. 7, 2016). "Fiduciary duty" is defined as "a duty of utmost good faith, trust, confidence, and candor owed by a fiduciary … to the beneficiary …; a duty to act with

[10] In essence, this is because if NDCRI is entitled for indemnification for its legal fees, NIDC would have no claim of entitlement to these partnership funds. They would therefore lack any cognizable injury from NDCRI's conduct.

the highest degree of honesty and loyalty toward another person and in the best interest of the other person." *In re Tolliver*, 464 B.R. 720, 746 (E.D. Ky. 2012) (internal citations omitted). "Under Kentucky law, partners owe each other a fiduciary duty." *Haymaker Development Co., LLC v. C.M. Gatton*, 2021 WL 297128, at *6 (E.D. Ky. Jan. 28, 2021) (citing *Waldman v. Stone*, 599 F. App'x 569, 575 (6th Cir. 2015); *Lach v. Man O'War, LLC*, 256 S.W.3d 563, 569 (Ky. 2008)).

"Gross negligence under Kentucky law is a wanton or reckless disregard for the safety of other persons." *Sanders v. Clements*, 2026 WL 883421, at *8 (W.D. Ky. Mar. 31, 2026) (citing *Kinney v. Butcher*, 131 S.W.3d 357, 358-59 (Ky. Ct. App. 2004)). "Kentucky distinguishes ordinary from gross negligence, the former meaning the absence of ordinary care, … and the latter meaning the absence of slight care." *Donegan v. Beech Bend Raceway Park, Inc.*, 894 F.2d 205, 207 (6th Cir. 1990); *Lowe v. Commonwealth*, 181 S.W.2d 409, 412 (Ky. 1944) ("Two degrees of negligence are recognized in Kentucky: 'Ordinary negligence,' or the failure to exercise care which ordinarily prudent persons would exercise in like or similar circumstances; and 'gross negligence,' which is the absence of slight care."); *Shearer v. Hall*, 399 S.W.2d 701, 703 (Ky. 1965) ("Gross negligence is the failure to exercise slight care."); see also *Hollingsworth v. Daley*, 2016 WL 5415781, at *19 (E.D. Ky. July 19, 2016) (collecting cases).

Based on the evidence before the Court, a genuine factual dispute exists surrounding the Parties' various conduct from the time of Blevins's death in 2010 until the ultimate sale of the complexes in 2022, such that a reasonable juror could find that NDCRI acted in violation of its fiduciary duties as a general partner and/or acted with gross negligence. In turn, then, a reasonable juror could also find that NDCRI was not entitled to indemnification for its legal fees incurred in connection with this case, under the language

set forth in Section 7.26. Therefore, the Court finds that neither party is entitled to summary judgment as to Count Seven of the Crossclaim Complaint.

The evidence at issue was actually presented by the Parties with respect to NIDC's various claims which alleged standalone claims for breach of fiduciary duty, gross negligence, and intentional misconduct, all of which were rendered moot by the breach of contract claims. However, the same evidence and conduct underlie this claim, because the partners intentionally chose legally operative language for the standard to determine entitlement to indemnification for legal fees. Ultimately, determining whether a breach of fiduciary duty occurred, or whether NDCRI acted with gross negligence in its handling of partnership affairs, is a fact-intensive analysis. See e.g., *Kendall v. Godbey*, 537 S.W.3d 326, 332 (Ky. Ct. App. Dec. 15, 2017) ("The breach of duty question is generally a fact issue for a jury.") (citing *A.A. By and Through Lewis v. Shutts*, 516 S.W.3d 343, 349 (Ky. Ct. App. 2017)).

Under NIDC's recitation of the relevant facts, NDCRI breached its fiduciary duties and acted with gross negligence in several distinct ways. First, NIDC claims a breach occurred where NDCRI erroneously treated Blevins-Clark and IBIA as substitute partners for the Blevins interests, without following the requirements of the Agreements, and sent them tax documents on an annual basis. Second, NIDC further claims a second breach occurred when NDCRI failed to notify NIDC, or any other partner, of the death of either Blevins or Baldwin, so that they could take proper corrective action.[11] Third, NIDC argues that the inconsistencies in NDCRI's conduct with respect to the disputed Blevins shares

---

[11] NIDC claims that NDCRI's knowledge of Blevins's death is evidenced by their treatment of his former interest in the Albany Manor partnership, which is not the subject of this litigation. There, NDCRI sent annual K-1s to the "Estate of Ivan G. Blevins", which demonstrates that current NDCRI leadership must have had some knowledge of his death at least as early as 2017. In response, NDCRI's representative testified that they failed to "connect the dots to the other partnerships" from Albany Manor.

demonstrates, at a minimum, a lack of the requisite loyalty at the core of their fiduciary obligations. To this effect, NIDC points out how NDCRI addressed the sale of the Albany Manor property in 2020, whereby they correctly applied the language of Section 7.18(c) of the partnership agreement and did not dispute NIDC's entitlement to the interest. NIDC further alleges that at the outset of the present dispute, Beacon officers acting on NDCRI's behalf noted that it would again acknowledge NIDC's right to the funds attributable to the Blevins and Baldwin interests, but abruptly shifted its position once Blevins-Clark filed her complaint in this matter. NIDC further alleges that NDCRI did not develop its proffered interpretation of the Agreements – whereby the 2004 Amendment deleted the applicable portions of Section 7.18(c) – in December 2025, some thirty-eight months into this litigation. Taken together, NIDC contends that the foregoing conduct could constitute a breach of fiduciary duty or grossly negligent conduct, and, in turn, renders NDCRI unentitled to indemnification for its legal expenses.

NDCRI presents a different characterization of this sequence of events. As a whole, it frames its conduct as an attempt to charter a neutral course between a limited partner, and a third party which it believed was lawfully entitled to a portion of partnership proceeds. NDCRI further contends that, once this litigation commenced, its hands were tied because the Court ordered the disputed partnership profits deposited first in escrow in defense counsel's IOLTA account, and later with the Court. Furthermore, NDCRI contends that not only was NIDC not entitled to notice regarding the death and substitution of a general partner[12], but that NIDC in fact received such notice in the form of annual audit reports which listed Blevins-Clark as a substitute general partner. NDCRI further points to an "evidentiary void" around the question of whether NDCRI notified NIDC of the

[12] NDCRI points to Section 6.03(c), which provides only that notice is required to the "investor limited partner" which would not include NIDC.

proposed substitution of Blevins-Clark as a general partner following Blevins's death.[13] Additionally, in regard to the alleged pre-suit communication inconsistencies, NDCRI notes that "[NIDC has] failed to demonstrate that there are no issues of material fact related to the interpretation of these communications, and the Court should decline Co-Defendants' invitation to improperly weigh evidence at the summary judgment stage related to the interpretation of pre-suit communications between lay witnesses that are open to various interpretations." [R. 211 at 24.]

The Court agrees with NDCRI's final characterization: understanding the full scope of actions leading up to this dispute and whether NDCRI's conduct is actionable requires evaluating the credibility of lay witnesses and, ultimately, resolving factual disputes. With the factual disputes before it, the Court is unable to determine, as a matter of law, whether NDCRI contravened its fiduciary duties or acted in a grossly negligent fashion. Thus, in turn, the Court is unable to determine whether, as a matter of law, NDCRI is entitled to indemnification for its legal fees incurred in conjunction with this suit, under Section 7.26 of the Agreements. Therefore, the cross-motions for summary judgment as to Count Seven of the Crossclaim Complaint are denied.

**6**

In addition to the legal holdbacks, NIDC further claims that NDCRI wrongfully withheld certain additional categories of funds after the sale of the complexes: (1) approximately $50,000 per property for "post-closing reconciliations" to be repaid to the partners "after giving a reasonable amount of time for all receipts, invoices, and payments to circulate and clear"; and (2) 4% of the purchase price for each property to cover

[13] Here, NDCRI points to testimony of the former NDCRI President, William Balsinger, who testified that he believed, but without certainty, that he notified NIDC of a proposed substitution of Blevins-Clark as general partner." [R. 211 at 23.]

representations and warranties, to be repaid to the partners seven months after closing. [R. 191 at 19-20.] These holdbacks first arose in March 2023, when NDCRI notified NIDC of various categories of funds which would be reserved following the sale of the apartment complexes. In NIDC's view, "the only final payables left are ones that should have been avoided had Beacon properly wound up the partnerships once they had no business remaining, there is no excuse to withhold money for seller's representations and warranties, and Beacon is actually holding the funds to potentially use toward its individual defense costs in this litigation." [*Id.* at 20.] [*See also* R. 219 at 18.] ("Beacon is withholding them still in 2026 as leverage over NIDC and to use them for an unintended purpose – further dissipation to its law firms").

Section 10.04 of the Agreements addresses the distribution of the proceeds from the sale, refinancing, or liquidation of any partnership property by establishing the applicable priority. [*See* R. 191-53.] First, the proceeds are to be applied "to the payment of debts and liabilities of the Partnership …, excluding debts and liabilities of the Partnership to Partners or any Affiliates[.]" [*Id.*] Second, and especially relevant here, the proceeds are to be applied "to the setting up of any reserves which the Liquidator deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Partnership[.]" [*Id.*] Then, and only then, are disbursements to be made to any of the partners pursuant to Section 10.04(a)(iii)-(vi).

Under the plain language of these provisions, the Court cannot conclude, and a reasonably jury could not find, that NDCRI violated the Agreements by maintaining these additional holdbacks. Section 10.04 clearly and unambiguously sets forth the priority by which the managing general partner must apply the proceeds from the sale or liquidation of any partnership property, which undoubtedly includes the apartment complexes at issue here. Only after the proceeds have been applied to the payment of partnership debts and

liabilities, and after the proceeds are applied to set up the requisite reserves may disbursements be made to any of the partners. And, Section 10.04 places significant discretion in the hands of the general partner, requiring only that it set up those reserves which it "deems reasonably necessary for contingent, unmatured, or unforeseen liabilities or obligations of the Partnership." [*See* R. 191-53.] NDCRI exercised that broad discretion in setting aside these reserves.

Rather than contending that the reserves created by NDCRI are objectively unreasonable, NIDC instead argues that "[t]he holdbacks breached the terms that Beacon proposed to NIDC to obtain consent from the investor limited partners to sell the Kentucky Partnerships." Around March 2022, during discussions about the potential sale of the complexes, NDCRI indicated to NIDC via email, that it would "have a holdback of $50,000 for settlement of final property payables that will be distributed two to three months post closing" and would also withhold "4% of the of the Purchase Price, to back the Seller's post-closing representation and warranty requirements capped at this amount in the Purchase Agreement that will be distributed after the expiration of the seven (7) month survival period." [R. 191 at 22; R. 191-35.] The letters were accompanied by a "Certificate of Partnership Authority" which was signed and returned by the limited partners. [R. 191 at 23; R. 191-55.] In NIDC's view, this certificate created a freestanding contractual obligation, which superseded Section 10.04, and required NDCRI to disburse the holdbacks along these timelines. [R. 191 at 23.] By continuing to withhold these funds, NIDC posits that NDCRI is in breach of their contract.

This argument falls short for several key reasons. First, NIDC does not assert that the Certificate of Partnership Authority created a distinct, independent contract between the partners. At any rate, such an argument would exceed the scope of what NIDC pleaded in Count VIII of its crossclaim, where it stated that the continued withholdings "constitutes

a breach of the partnership agreements of the Kentucky Partnerships." [*See* R. 73 at 23.] Second, the Certificate also cannot constitute an amendment to the partnership agreements. Each of the prior amendments, three in total, follow a consistent format detailing the changes which the amendment brings into effect, and includes a signature for each of the partners, as required by the Agreements. The partners, by signing a certificate of partnership authority related to holdbacks following the sale of the partnerships' key assets, cannot have been on notice that, by signing, they were actually amending the partnership agreements.

Third, and perhaps most fatally to the claim, is the fact that NIDC assert no damages separate and apart from those included in Count VII, which pertains to the use of holdbacks for legal fees. To explain, the only damages which NIDC claims resulted from the long withholding period is the Beacon Defendants' purported usage of those withholdings to pay their legal expenses. NIDC does not otherwise allege that the creation of the reserves was improper, or that the continued existence of such reserves violates the Agreements. If the Beacon Defendants' indemnification for its legal fees violates the Agreement, that injury will be fully redressed by Count VII of the Crossclaim Complaint.

At bottom, the continued existence of the holdbacks does not violate the Agreements and cannot form the basis of a breach of contract claim. Section 10.04 of the Agreements grants the managing general partner broad discretion in the setting aside of reserves, out of the proceeds from the sale of partnership property, to address contingent, unmatured, or unforeseen liabilities that may arise following the sale. At present, the partnerships continue to operate and continue to accrue certain routine liabilities. Furthermore, ever since the sales proceeds were generated following the sale, the assets of the partnership have been the central subject of this litigation, creating further uncertainty as to potential future partnership liabilities. The continued existence of these reserves so long as this

uncertainty remains does not violate the plain language of the Agreements. Nor does the relatively informal email correspondence between the partners give rise to some obligation on NDCRI's part to accelerate the disbursement of the holdbacks. And insofar as any usage of those withholdings towards the managing general partner's legal bills is improper under the Agreements, that will be redressed by Count VII. Count VIII, therefore, does not present a viable claim and the Beacon Defendants are entitled to judgment as a matter of law.

**D**

The remaining Beacon Defendants – those other than NDCRI – are named in this suit for the sole purpose of Blevins-Clark's and NIDC's request that the Court pierce the corporate veil. First, because Blevins-Clark cannot recover against NDCRI on any of her legal or equitable claims contained in its Amended Complaint, the Court will not address her motion to pierce the corporate veil.

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). That being said, "the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. 51, 61-63 (1998). The Kentucky Supreme Court has explained the rationale underpinning the doctrine of piercing as follows:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of

> the corporation as a separate entity would sanction a fraud or promote injustice.

*Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 155 (Ky. 2012). Despite its name, "[t]he doctrine can also apply to limited liability companies." *Turner v. Andrew*, 413 S.W.3d 272, 277 (Ky. 2013); see also *Kaycee Land and Livestock v. Flahive*, 46 P.3d 323, 327-328 (Wyo. 2002) ("We can discern no reason, in either law or policy, to treat LLCs differently than we treat corporations… Most, if not all, of the expert LLC commentators have concluded the doctrine of piercing the veil should apply to LLCs.").

Ultimately, "[t]he burden of proof to demonstrate grounds for piercing the corporate veil is on the party seeking to impose liability on the parent corporation." *Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC*, 988 F. Supp. 2d 772, 783 (W.D. Ky. 2013) (citing *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007)). In sum, piercing the corporate veil requires the movant to prove "two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice. *Inter-Tel Techs., Inc.*, 360 S.W.3d at 165. "The issue of whether to pierce the corporate veil under Kentucky law is an equitable determination for the court, and not one for the jury." *Thornton v. Dutch Nats. Processing, LLC*, 629 F. Supp. 3d 777, 797 (M.D. Tenn. 2022) (citing *Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 174-75 (Ky. 2012)).

**1**

Determining whether there has been a sufficient loss of corporate separateness to merit piercing a party's corporate veil requires the balancing of numerous factors including:

(1) Inadequate capitalization;
(2) Failure to issue stock;
(3) Failure to observe corporate formalities;

(4) Nonpayment of dividends;
(5) Insolvency of the debtor corporation;
(6) Nonfunctioning of the other officers or directors;
(7) Absence of corporate records;
(8) Comingling of funds;
(9) Diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors;
(10) Failure to maintain arm's-length relationships among related entities; and
(11) Whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.

*Michael W. Dickinson, Inc. v. Keeneland Ass'n*, 2017 U.S. Dist. LEXIS 45011, at *6-7 (E.D. Ky. Mar. 28, 2017) (citing *Inter-Tel*, 360 S.W.3d at 163).[14] That being said, "the most critical factors are 'grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature.'" *Thornton*, 629 F. Supp. 3d at 797 (citing *Arapahoe Res., LLC v. Pro. Land Res., LLC*, 2015 U.S. Dist. LEXIS 108419, at *3 (E.D. Ky. Aug. 15, 2015); *Inter-Tel Techs., Inc.*, 360 S.W.3d at 164) (applying Kentucky law).

**a**

Beginning with the question of inadequate capitalization, the parties are in substantial disagreement as to whether NDCRI is inadequately capitalized. The core of this disagreement is the subject of a distinct motion, in which NIDC and Malvern seek to strike the declaration of Timothy Cowles, which was filed in conjunction with NDCRI's response, as well as the summary judgment motions filed by the other Beacon Defendants. The Court must first address whether the Cowles declaration should be stricken from the

[14] Although the *Inter-Tel* veil piercing framework applies to both corporations and LLC's, the Court acknowledges that several of the factors set forth in *Inter-Tel*, such as "failure to issue stock," for example, do not squarely apply in the LLC context. Consequently, to some extent, the Court is required to lean more heavily into those factors which apply to both corporations and LLCs on an equal basis.

record, and will then turn to the question of whether NIDC has demonstrated that NDCRI is undercapitalized so as to suggest that veil piercing is warranted.

**i**

NIDC and Malvern seek to strike five paragraphs of the February 27, 2026, declaration from Timothy Cowles, the Chief Financial Officer of Beacon. [*See* R. 217.] In reliance on this declaration, NDCRI asserts in regard to its own capitalization that, "NDCRI is a demonstrably solvent company that controls substantial unliquidated assets totaling $8,306,344 and further receives 175,000 annually in distributions and incentive management fees[,]" and that this valuation is based on the market value of NDCRI's interest in apartment complexes owned by approximately seventeen partnerships in which NDCRI is a partner. [R. 194 at 4-5.] In NIDC's view, this declaration directly contradicts with Cowles's deposition testimony, in which he was asked whether NDCRI had "an estimate anywhere internally of the total value of those ownership interests, aside from tax basis accounting." [R. 217 at 2; R. 217-1 at 14.] Cowles responded that NDCRI did not have those numbers and did not have a practice of obtaining that information with regularity. [*Id.*] Therefore, NIDC contends that because Cowles testified that such valuation information was not available and did not supply estimates during discovery, he cannot now provide contradictory information to the Court once discovery has closed.

NDCRI, on the other hand, attempts to paint this apparent disconnect in a different light. NDCRI provides that it was served notice from NIDC on October 29, 2025, pursuant to Rule 30(b)(6) to take the testimony of NDCRI's corporate representative, and listed as a noticed topic "the capitalization, net asset value, and net liability value for each of the Beacon Defendants at end-of-fiscal year for 2017-2024 and at present as of the date of the deposition held under this notice." [R. 154.] NDCRI notes that Cowels "provided NDCRI's capitalization for each fiscal year," but specifically pointed out that "these are all income

tax basis accounts, accounting" and that it reflects their records because "we keep the books on a tax basis." [R. 231 at 2.] Insofar as Cowles was asked about NDCRI's total assets and liabilities, NDCRI notes that it objected to this line of questioning, "on the ground that this inquiry exceeded the scope of the noticed deposition topics, which sought only the 'net' asset and liability value." [*Id.*] When asked directly, "[d]oes Beacon have an estimate anywhere internally of the total value of those ownership interests, aside from tax basis accounting?" Cowles responded that he did not have immediate access to that information, because it was outside the scope of the noticed topic, but that information could be put together upon request.[15] [*Id.*; R. 231-1 at 7.] NDCRI further observes that Cowles sat for two subsequent depositions as NDCRI's corporate representative – on December 9, 2025, and March 4, 2026 – and that NIDC did not seek to compel his testimony regarding the market value of NDCRI's partnership interests at either.[16] Furthermore, NDCRI provides that discovery in this matter remained ongoing after Cowles's October deposition, and "[d]espite Mr. Cowles' explicit testimony that he could, if asked, retrieve information concerning the estimated market value of NDCRI's assets, the Co-Defendants neglected to serve any discovery request for such information." [R. 231 at 3.] Therefore, in NDCRI's view because the declaration addresses market value, which was not the subject topic at issue in the October Cowles deposition, it does not contradict with the deposition testimony and should not be stricken.

As a general rule, "[a] party may not create a factual issue by filing an affidavit,

[15] NIDC specifically contests NDCRI's characterization of this statement. In NIDC's view, NDCRI's counsel promised to obtain that information and to provide an estimate to NIDC before discovery concluded. Ultimately, it is undisputed that NDCRI never disclosed this information to NIDC during discovery. Rather, NDCRI contends that regardless of any statements during the deposition, NIDC still had an obligation to formally request the information through a request for production, and, since they failed to do so, they elected to not provide this information.

[16] NDCRI also opines that, even had NIDC sought to compel testimony related to this market valuation at one of these depositions, it still would have been improper because NIDC never properly noticed this topic in their deposition notices.

after a motion for summary judgment has been made, which contradicts her earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984)). In more recent cases, the Sixth Circuit has sought to define the scope of the rule it set forth in *Reid*, writing

> The rule set forth in *Reid* is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. *Reid* and its progeny have thus barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony.

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006) (citing *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001)). This, however, "is a far cry … from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." *Id.* An affidavit of this latter variety, "fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." *Id.*

"If … there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* at 908 (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). The *Franks* Court set forth a non-exhaustive list of factor to determine whether a "sham fact issue" has arisen, including "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Franks*, 796 F.2d at 1237.

Here, Cowles's declaration does not contradict his deposition testimony and therefore should not be stricken. During the deposition, Cowles was asked to provide information about the capitalization of NDCRI and provided this information in the form of tax basis accounts, which reflects the routine balance sheet practices of NDCRI. Cowles provided this information. Cowles was then asked to provide information about the value of NDCRI's ownership interests in various other partnerships, "aside from tax basis accounting[,]" and Cowles responded that he did not have that information available at that time. The reason Cowles did not have this information available during the deposition is because the "market value" of NDCRI's portfolio was not a noticed topic. Thus, Cowles did not research this question, nor did he prepare any documentation to that effect, prior to the deposition. Rather, he informed NIDC's counsel that such information was available, even though he did not have it with him, and that it could be compiled and made available. The Cowles declaration contains precisely this "market value" information. Cowles cannot be held at fault for failing to come prepared to testify on information outside the scope of the Rule 30(b)(6) notice. Nor can NDCRI be faulted for then introducing this non-contradictory evidence in the form of a declaration at the summary judgment stage. In other words, the "market value" information included as part of the Cowles declaration does not contradict with the tax-basis information he provided during the deposition; rather, it provides financial information of a different sort.

Nor does the declaration give rise to a sham fact issue. For one, it does not fall within any of the categories of sham fact issues previously recognized in *Franks*, as adopted by the Sixth Circuit. Furthermore, it would be squarely illogical to find the existence of a sham fact issue present in a non-contradictory assertion when the contents of the latter declaration fall outside the scope of the noticed topics which were the subject of the original deposition.

NIDC's attempt to concoct a narrative of deception based upon statements made by NDCRI's counsel during the deposition fail to move the needle. NIDC states that NDCRI's argument "completely ignores that NIDC's counsel asked Beacon's counsel to provide the information that Beacon's counsel promised to do so on the record in the deposition." [R. 236 at 3.] NIDC further provides that "Beacon's counsel even went further to condition Beacon's use of the information for summary judgment purposes on first providing the information to NIDC." [See. R. 217-1 at 16] ("I may want it for my summary judgment motion. So if we're going to use it, you will definitely get it."). NIDC's counsel responded to this statement by saying, "[w]ell, if you're going to use it, we're going to get it[.]"[17] [*Id.*] These speculative and hypothetical statements did not create some enforceable obligation upon NDCRI to prepare documentation and then disclose it to NIDC. Even if NIDC *presumed* that NDCRI's counsel was promising to promptly provide this "market value" information, the solution seems simple: once time passed and the information had not been disclosed, move to compel the production of this information. NIDC did not do this, however, apparently electing to instead rely on the equivocal and contingent side-statements made by counsel during the deposition. NIDC further compounded this unjustifiable reliance by failing to ask about the "market value" information it now claims to have been expecting in either of its subsequent depositions with Cowles. NIDC's shortcomings in obtaining this information during discovery cannot now be salvaged by striking a declaration that simply does not contradict with the affiant's deposition testimony.

As an additional matter, NIDC's reliance on *Smith* and *Lockard* is likewise

[17] Just as NIDC reads this statement as a promise by NDCRI that it will prepare and disclose information about the market value of NDCRI's partnership interests, NDCRI could equally construe this statement from NIDC's counsel to suggest that it would seek to compel the production of this information (i.e., we're *going to* get it).

misplaced. In *Smith v. Consolidated Rail Corp.*, which involved essentially the same factual circumstances as Reid itself, the deponent, a lay witness, was "specifically questioned" about key factual questions related to her employment interview, provided a less than forthcoming answer, then submitted a contradictory affidavit later in the litigation. *Smith*, 1996 U.S. App. LEXIS 19126, at *10-12 (6th Cir. 1996); *cf. Reid*, 790 F.2d at 460. Here, by contrast, Cowles was specifically questioned at the deposition about the market value of NDCRI's partnership interests, but unlike the deponent in Smith, Cowles did not answer. Rather, he acknowledged that he did not have that information available, because it was not a noticed topic, and acknowledged that it could be compiled and made available later upon request. In other words, this case lacks the sort of bald contradiction present in *Smith* and *Reid*. In *Lockard v. General Motors Corp.*, the Sixth Circuit somewhat expanded the scope of *Reid*, holding that a party's "ample opportunity during discovery to present evidence provides courts with reason to prevent that party from introducing new evidence in an affidavit opposing summary judgment" constitutes an independent basis for striking all or part of an affidavit. *Lockard*, 52 F. App'x at 789. Importantly, the Sixth Circuit in *Aerel* appeared to draw back the more expansive interpretation of the *Reid* holding in cases like *Lockard*. See *Aerel*, 448 F.3d at 907 ("In our opinion, the expansive view of the *Reid* rule adopted in the latter two of these nonprecedential opinions [*Lockard* and *Rosinski*][18] is unwarranted.").[19] Regardless, the circumstances underlying the *Lockard* opinion are distinguishable from those at bar.

At bottom, the Cowles declaration does not contradict with the testimony he

---

[18] See *Rosinski v. Electronic Data Systems Corp.*, 1991 U.S. App. LEXIS 19126 (6th Cir. 1991).

[19] Although the *Aerel* Court did not reach the question of whether the district court abused its discretion by relying on the *Reid* holding as extended by the unpublished opinions in *Lockard* and *Rosinski*, because the district court misapplied the rule regardless, the Court nonetheless expressed clear disfavor for that expanded interpretation.

provided in the October 2025 deposition, nor does it create a sham factual issue. Consequently, there is no basis upon which the Court can strike portions of it from the record. The Court will therefore consider the declaration, in full, in evaluating the relevant questions to which it pertains.

**ii**

In *Inter-Tel*, the Kentucky Supreme Court clarified that the "consideration of the adequacy of capitalization concerns the financing of the corporation, not its condition at the time of the events complained of or thereafter." *Inter-Tel*, 360 S.W.3d at 167 (citing *Anderson v. Abbott*, 321 U.S. 349, 362 (1944)). "Thus, the undercapitalization inquiry focuses on whether or not [the defendant] was undercapitalized at the time of the initial financing." *Pro Tanks Leasing v. Midwest Propane & Refined Fuels, LLC*, 988 F. Supp. 2d 772, 786 (W.D. Ky. Dec. 18, 2013). In turn, "[s]ubsequent economic developments that weaken the debtor's financial condition, even those leading to insolvency, are irrelevant for [the determination of whether undercapitalization exists if the corporation was adequately financed at the outset." *Inter-Tel*, 360 S.W.3d at 167.

The *Inter-Tel* Court also set forth two caveats to this general rule which, under certain circumstances, expand the lens of the undercapitalization inquiry. First, "[w]hen the inadequacy of capitalization arises after commencement of the business, as a result of capital transfers to the controlling shareholder, it may be taken into account; the withdrawal renders the initial inadequacy irrelevant." *Id.* Second, "when the corporation substantially expands its size or the nature of its business, its capital requirements change, and there may be undercapitalization of the new business despite any additional infusion of capital." *Id.* Although they do not state so clearly, NIDC's undercapitalization argument focuses on this first caveat. NIDC presents no evidence that the *initial* capitalization of

NDCRI was inadequate in any way.

NIDC's characterization of NDCRI's capitalization focuses on its current financial situation, and in particular the tax-based accounting records which were the subject of the Cowles deposition testimony. NIDC states that "NDCRI's capitalization – its assets minus its liabilities – has been a negative value since 2018." [R. 191 at 29.] It acknowledges, however, that "NDCRI's assets are mostly or almost exclusively these … interest in various partnerships and entities that own real property." [*Id.*] NIDC suggests that this demonstrates inadequate capitalization, market value notwithstanding, because "NDCRI cannot liquidate those assets without the consent of third parties." [*Id.*]

NDCRI paints a starkly different picture of its financial situation, largely reliant upon the Cowles declaration. First, and perhaps most critically, NDCRI states that it "is well capitalized" and "enjoys over $8 million in members' equity at this juncture." [R. 194 at 10.] It further provides that "the assets of the four Kentucky Partnerships have been properly preserved and documented by NDCRI" and "those assets have been meticulously maintained in the respective operating account of each partnership, rather than comingled in any account held by NDCRI." [*Id.*] It therefore contends that NIDC's "arguments to the contrary are entirely speculative and unsubstantiated by any actual evidence in this case." [*Id.*]

Again, what initially appears like conflicting testimony at first glance actually reflects the different financial metrics NIDC and NDCRI rely on to frame their argument. During his deposition, Cowles clarified that the financial information he provided reflected NDCRI's tax-basis accounting, which reflects the method by which NDCRI generally maintains its books. Such tax-basis accounting practices do not generally encompass the true market value of all of a company's assets because, ultimately, this information is of no consequence to the taxing authorities. The information provided by the Cowles declaration,

which includes the market value of the partnership interests owned by NDCRI, demonstrates a more comprehensive assessment of its capitalization. This information is not reflected in the balance sheet. As Cowles explains,

> [t]hat is because the value of NDCRI's interest in various partnerships is recorded at 'income tax basis' on its balance sheet, which is a calculation that stems from NDCRI's original investment in those partnerships, or 'basis.' NDCRI's balance sheet is maintained in this manner in order to facilitate its compliance with the Internal Revenue Code, and otherwise align with best accounting practices.

[R. 194-3 at 3.] NDCRI also identifies two additional lines of revenue – "approximately $125,000 of annual incentive management fees from two of the seventeen partnerships" and "approximately $50,000 in annual distributions as a result of its ownership interest in various partnerships" – both of which are unrelated to their interests in the Kentucky Partnerships. This information suggests that the simple fact that NIDC and NDCRI have submitted different financial information to formulate their argument does not give rise to a genuine dispute of material fact. Here, no such factual dispute exists. The Court finds that this factor weighs against a finding of undercapitalization resulting in a loss of corporate separateness.

**b**

Next, NIDC contends that the Beacon Defendants egregiously failed to observe various legal formalities and continually disregarded the distinctions between parent and subsidiary. In NIDC's view, the absence of distinction between the various Beacon Defendants here is evident from the "Certificate of Organization of Beacon Communities LLC" which states that the business purpose of Beacon Communities LLC shall be:

> to (i) conduct a real estate business including without limitation the acquisition, development, redevelopment, ownership, asset management and disposition of multifamily rental, condominium and mixed-use properties and (ii) engage in other activities related or incidental to the foregoing. The

> foregoing activities shall be pursued primarily though organization of, or participation in, a limited liability company, limited partnership, joint venture or other entity (whether or not wholly-owned by the LLC).

[R. 233 at 22-23; R. 233-8.] In other words, NIDC posits that this statement of purpose demonstrates Beacon's intent to minimize corporate separateness from its very inception. This alone is clearly not enough, however, and NIDC points to several additional observations to denote further disregard of the distinction between the various entities.

First, NDCRI, Keystone, NDCREM, and Beacom Companies lack their own boards of directors. Beacon Communities also lacks a board of directors but acknowledges that it "has a manager board via Mount Ebal LLC," which is Beacon Communities' managing member. [R. 191 at 27; R. 191-9 at 50-52.] The Mount Ebal manager board consists of only two people is "responsible to manage Beacon Communities" and make major decisions on Beacon Communities behalf.[20] [*Id.*] Additionally, many of the senior officers at Beacon Communities have also simultaneously hold officer roles in Beacon Companies, Keystone, and NDCREM simultaneously. [*Id.*; see also R. 191-57.] NDCRI, however, had no officers of its own, because it was "wholly owned by Keystone." [R. 191-9 at 36.]

This web is further complicated by the fact that NDCRI, Keystone, Beacon Communities, and Beacon Companies lack their own employees. Beacon Communities and Beacon Companies jointly own another entity, Beacon Residential Management LP, which is "the employment entity of Beacon Communities," and employs the individuals who perform the regular functions of NDCRI, Keystone, and Beacon. [R. 191 at 28; R. 191-9 at 2, 8, 11-15.] No formal agreement dictates this employment arrangement, and the Beacon Defendants acknowledge this is because of the common ownership among the entities. [R.

[20] One of the two members of the Mount Ebal LLC managing board is Howard Cohen, who is also the sole director and president of the Beacon Companies Inc., and an officer of Keystone.

191-9 at 15.]

As an additional matter, several other financial and managerial considerations point to the overlapping nature of the Beacon entities. NDCRI does not maintain its own bank accounts, with all revenue flowing directly to and from Keystone. [*Id.* at 41-43, 45.] As Cowles stated during his deposition, "NDCRI gets a bill for something and Keystone Values uses the bank account in its name to issue payment for that bill" and "when Keystone Values uses its accounts to pay the bills and liabilities of NDCRI, it does that for all of NDCRI's expenses." [*Id.*] This arrangement also applies to any profits received by NDCRI. [*Id.* at 49-50.] NDCRI also does not insure itself individually; rather the Beacon Defendants obtain these policies together and are listed alongside one another as insureds on the same policies. [R. 191 at 29; R. 191-9 at 16-17, 19.] NDCRI and the other Beacon Defendants share the same office space located in Boston, Massachusetts, for which NDCRI pays no rent and owns no office equipment of its own. [R. 191-58 at 3-4.]

Rather than refuting the foregoing, NDCRI attempts to frame NIDC's argument as "rest[ing] almost entirely on the use of 'Beacon' branding on emails and letterhead, in pre-suit communications regarding the Disputed Partnership Profits." [R. 194 at 10-11.] NDCRI is undoubtedly correct in stating "[t]he mere use of common branding and logos … does not justify piercing the corporate veil under Kentucky law." [*Id.*] In support of this proposition, NDCRI cites to a string of Kentucky cases holding, under various factual circumstances, that a franchisor cannot be held liable for certain actions of its franchisee, despite their usage of common advertising and branding materials. [Id. at 11.] While this is certainly an accurate assessment of the law of franchises, it is inapposite to the present case. Here the defendant parties are not in a franchise relationship with a parent company, and are rather in an ownership dynamic where the parent companies exert an extraordinary degree of control over subsidiaries which lack any capacity to act

independently. *See infra*, Section III(D)(1)(c). In other words, this situation extends well beyond a mere shared usage of name and corporate identity between several independent functional entities.

Taken together, the uncontroverted facts laid out by NIDC adequately demonstrate that the Defendant entities embrace a high degree of disregard for corporate formalities and/or a distinctiveness between each individual entity, to suggest a loss of corporate separateness. Among these facts, the most concerning is the absence of any officers, directors, or even employees of NDCRI, which requires the various entities to share critical executives without clear delineations of the respective duties or responsibilities owed to each company. Beyond that, NDCRI lacks other key hallmarks of its separate identity including its own workspace, its own bank accounts, or its own insurance policies, to name a few. While any of these things standing alone would likely be insufficient, the combination of them points toward a structure whereby NDCRI bears minimal distinctiveness from its parent companies beyond the maintenance of a different balance sheet and tax filings. Thus, the Court finds that this factor weighs in favor of finding a lack of corporate separateness.

**c**

Turning third, and finally, NIDC argues that NDCRI, any by extension the Kentucky Partnerships, are controlled by the remaining Beacon Defendants. NIDC argues that "Beacon Communities managed, and was responsible for, NDCRI's actions that are relevant to its role as managing general partner of the Kentucky Partnerships and the actions underlying this dispute." [R. 191 at 30.] In NIDC's view, a finding that NDCRI is controlled by Beacon is forced by Cowles own deposition testimony in which he stated, unequivocally, that "Beacon Communities has a role to run the day-to-day operations of Keystone Values" and that Beacon Communities is responsible for "overseeing and running

the day-to-day operations of … the NDCRI general partner and responsibilities and things of that nature." [*Id.*; R. 191-9 at 13.]

NDCRI counters that "[t]here is no evidence that Beacon Communities exercises any control, much less an improper level of control, over the day-to-day operations and decisions of NDCRI." [R. 194 at 12.] NDCRI again contends that "NIDC's entire pierce the veil claim against Beacon Communities rests on the use of a trade name by individuals who were not employed by Beacon Communities" and that "[t]he record is clear that Beacon Communities cannot control the day-to-day operations of Keystone or NDCRI, which should be dispositive of any claim against Beacon Communities." [*Id.* at 13-14.] And, with respect to Keystone, the Defendants state, without citation, that "Keystone does not provide services for, and is not engaged in, the day-to-day management or operations of NDCRI." [*Id.* at 15.]

The complex web of interrelationships, once untangled, almost alone forces the inescapable conclusion that Beacon Communities and Keystone entirely control NDCRI. This is all the more true where, as discussed above, NDCRI lacks its own officers, directors, employees, office space, bank accounts, or insurance policy, and rely on Keystone and Beacon for all of the foregoing. Beacon Communities owns 100% of Beacon Keystone LLC, which owns 50% and is the managing member of Keystone Values MM LLC, which in turn owns 36.91% and is the managing member of Keystone. [R. 191 at 31; R. 194 at 3.] Recall that Keystone, in turn, owns NDCRI. By its own definition the role of a "managing member" is "managing the LLC, so the day-to-day business and all of that." [R. 191-9 at 10.]

The Beacon Defendants are correct that, generally speaking, economic realities often force related companies to share certain operational responsibilities, and that such integration, standing alone, is generally insufficient to support disregarding the corporate form. See e.g., *Papa v. Katy Indus.*, 166 F.3d 937, 942 (7th Cir. 1999). At least with respect to Beacon Communities and Keystone, the facts demonstrate something well beyond

streamlined integration between separate entities for purposes of efficiency. Rather, the direct control exercised upon NDCRI by Beacon Communities and Keystone is demonstrated through the trail of ownership and managing membership tying the three entities together. Furthermore, this chain of control, coupled with the lack of corporate formalities discussed prior, begs the question: how could NDCRI operate at all without the control of another? It lacks any employees, officers, or directors. It has no office space and does not maintain its own bank accounts. In fact, Timothy Cowles, the corporate representative put forth to testify at several depositions on NDCRI's behalf, is, in fact, a Beacon Communities officer. This suggests, at a minimum, that NDCRI can only speak when Beacon speaks. In this framework, NDCRI's role falls somewhere between at best a barebones investment vehicle, or worse, a corporate puppet. The record squarely indicates that there is nothing self-sufficient about NDCRI. On its own two feet, NDCRI consists of nothing more than a balance sheet, which includes investments in the form of partnership interests in some seventeen partnerships, excluding those presently at issue. In other words, NDCRI's ability to do anything at all is directly tied to either Beacon Communities or Keystone's ability and willingness to act on its behalf. Needless to say, this critical factor weighs strongly in favor of finding a high degree of control over the subsidiary's operations and decision-making, including those of a day-to-day nature, and therefore suggests a lack of corporate separateness.

The circumstances with respect to the Beacon Companies and NDCREM are materially different, however. Unlike Beacon Communities and Keystone, NIDC cannot demonstrate any degree of control over NDCRI exercised by either Beacon Companies or NDCREM. [*See* R. 195.] Although a parent-subsidiary relationship between the parties is not a prerequisite to veil piercing, there still must be some degree of connection between the entities beyond merely existing in the same family of companies under the same

umbrella. See *Inter-Tel*, 360 S.W.3d at 166 (collecting cases where veil piercing was applied to companies lacking a parent-subsidiary relationship). That notwithstanding, NIDC has failed to demonstrate any degree of *control* which NDCRI or Beacon Companies exhibit over NDCRI. Without doubt, there is some degree of connection between all of the various Beacon entities, because, as discussed above, they generally fail to adhere to corporate formalities and do not function at arms-length. Even so, that is a distinct inquiry from whether NDCREM and Beacon Companies actually exert *control* over NDCRI. The fact that both NDCRI and NDCREM draw officers and executives from the same pool does not necessarily mean that one controls the other. When compared to Beacon Communities and Keystone, the proximity between Beacon Companies, NDCREM, and NDCRI is far more attenuated.

When viewed in totality, the first of the two prongs of the veil piercing analysis is satisfied: the Court finds that there is sufficient domination of NDCRI to merit a finding of a lack of corporate separateness between NDCRI, Beacon Communities, LLC, and Keystone Values, LLC. In reaching this finding, the Court notes that two of the three "critical" *Inter-Tel* factors weigh in favor of such a finding. Although the evidence indicates that NDCRI is adequately capitalized, it also suggests that the various Beacon Defendants frequently fail to maintain any legal or practical distinctions between the various entities in their network. As to the third factor, the evidence further indicates a high degree of control by Beacon Communities and Keystone over NDCRI's operations and decision-making, including on day-to-day matters. On the other hand, NIDC has failed to make such a showing of control and domination with respect to Beacon Companies or NDCREM. Consequently, with two of three factors weighing in favor, the Court finds an actionable lack of corporate separateness between NDCRI, Keystone, and Beacon Communities. However, with two of three factors weighing against such a finding with respect to Beacon

Companies and NDCREM, the Court finds that there is not an adequate lack of corporate separateness to merit piercing the veil with respect to these Defendants. Thus, Beacon Companies and NDCREM are entitled to judgment as a matter of law at this juncture, while the inquiry will proceed with respect to the other Beacon Defendants.

**2**

To determine whether a case presents circumstances under which continued recognition of the corporate form would sanction fraud or promote injustice, the *Inter-Tel* Court adopted the analysis of the Seventh Circuit in *Sea-Land Services, Inc. v. Pepper Source*. *Pro Tanks Leasing*, 988 F. Supp. 2d at 792 (citing *Inter-Tel*, 360 S.W.3d at 164-65). In that case, the Court specifically clarified what circumstances would "promote an injustice[,]" stating:

> [W]e see that the courts have properly have pierced the corporate veils to avoid "promoting injustice" have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

*Sea-Land*, 941 F.2d 519, 52-24 (7th Cir. 1991). The "mere inability to collect a debt from a corporation" is insufficient. *Inter-Tel*, 360 S.W.3d at 165.

The Court is unconvinced that the record demonstrates that the Defendants would be unjustly enriched by continued recognition of the corporate form, at least not at the present juncture. NIDC claims that "it would be an injustice to permit Beacon to 'escape' liability created by its employees and officers in fulfilling their role of running the day-to-day business of NDCRI and Keystone," and that "[d]oing so would unjustly enrich the people who intentionally created this corporate structure." [R. 191 at 32.] Again, however,

NDCRI makes no claim to the disputed funds attributable to the Blevins or Baldwin shares. Absent such a claim, it is difficult to see how NDCRI, Beacon, or Keystone would be enriched at all, regardless of whether NIDC is entitled to these funds. NDCRI, Beacon, and Keystone could potentially be unjustly enriched if it were determined that NDCRI was not entitled to indemnification for its legal fees in this case but nonetheless withdrew these funds from the partnership coffers during the pendency of this case. For sake of argument, if it were determined that NDCRI was not entitled to these funds, they would otherwise go to NIDC and, consequently, NDCRI would be unjustly enriched if they wrongfully withdrew such funds from the partnership accounts. Determining whether unjust enrichment has occurred, however, cannot occur until it has been determined whether NDCRI's indemnification was permitted under the Agreements. And this question is ultimately one for the jury.

The Court can conclude that "a parent corporation … caused a sub's liabilities and its inability to pay for them would escape those liabilities" and therefore satisfies the second *Inter-Tel* / *Sea-Land* scenario sufficient to pierce the corporate veil. As NIDC already sufficient demonstrated under the "corporate separateness" prong of the *Inter-Tel* analysis, insofar as any of NDCRI's liabilities have arisen, they must have accrued due to actions undertaken by Beacon Communities or Keystone officials. Recall that NDCRI has no officers, directors, or employees of its own and that NDCRI can act or speak only when a Beacon or Keystone officer or employee acts on its behalf. Consequently, any breach of the Agreements or any resulting violations of NDCRI's fiduciary duties as managing general partner must necessarily have involved the participation of NDCRI's parent, Keystone, or its grandparent, Beacon Communities. And while the Beacon Defendants have demonstrated that NDCRI is adequately capitalized, it has not demonstrated that it has any ability to pay damages. While the capitalization inquiry is solely focused on the assets

which an entity holds in its own name, this "factor" is squarely concerned with the subsidiary's liquidity (i.e., its ability to pay a judgment). The various partnership interests owned by NDCRI are highly illiquid, especially considering it would require the consent of various other partners in order to sell any partnership property, which is the core value of the interests.

When this likely inability to pay – at least any amount in excess of that currently remaining in the Kentucky Partnerships' accounts – is coupled with the inescapable conclusion that any liability directly results from the actions taken by an officer or employee of the parent entity, the Court can conclude that continued recognition of the corporate form would result in manifest injustice beyond a mere inability to recover. Consequently, having found the two *Inter-Tel* elements are satisfied, the Court will pierce the corporate veil of NDCRI, Beacon Communities, and Keystone Values.

**E**

Also before the Court are two motions for forms of injunctive relief, related to certain disputed funds, that arose during the pendency of the motions for summary judgment. In the first motion, Blevins-Clark moves the Court to order the release of a portion of the settlement funds previously deposited with the Court, pursuant to Rule 67(b). [R. 187.] In the second motion, NIDC and Malvern move the Court to issue a preliminary injunction ordering the Beacon Defendants to deposit a total of $1,599,598.00 with the Court, which is greater than the amount already deposited, to safeguard such funds until a final judgment is rendered in this case. [R. 204.] The Court will address each motion in turn.

**1**

In a separate motion, Blevins-Clark requests that the Court release the funds attributable to the Blevins share of the Jackson Street Towers partnership in the total sum of $5,284.00. The Jackson Street Towers partnership is differently situated from the four

partnerships discussed above, because NIDC was never a partner in the Jackson Street Towers partnership. Nevertheless, the sale of the apartment complexes to Amity, which is at the core of this dispute, involved five partnerships, including Jackson Street Towers, and the profits associated with all five of Blevins's shares, including Jackon Street Towers, was deposited with the Court. [*See* R. 117.]

NIDC does not claim entitlement to any proceeds from the Jackson Street Towers property. Rather, it opposes the immediate disbursement on several bases, each of which concerns the timing of the disbursement relative to the remaining issues in this case. First, NIDC contends that disbursement is improper because the funds currently deposited with the Court were not itemized by the sale amount attributable to each individual property, therefore it is impossible to ascertain which specific funds derive solely from the Jackson Street property. [R. 201 at 2.] Second, NIDC states that the value of its claims here "exceed and attaches to every dollar in the court account plus more, meaning that the court account is not sufficient to satisfy NIDC's potential judgment." [*Id.*] Additionally, NIDC contends that Blevins-Clark's request is premised upon a tentative partial settlement agreement between the parties, and thus, has not yet reached fruition. To that effect, NIDC states "[Blevins-Clark] and Beacon may have reached a tentative settlement agreement that is contingent on NIDC's consent, but NIDC does not consent, and the foregoing demonstrates that the dust has yet to settle regarding who owns the money in the court account." [*Id*. at 4.] Consequently, while NIDC does not claim that Blevins-Clark will never be entitled to the funds attributable to Ivan Blevins's interest in the Jackson Street partnership, it does contend that she is not entitled to an *immediate* disbursement of those funds from the money presently deposited with the Court. In short, the Court disagrees and finds that no legal barrier exists to prevent Blevins-Clark from immediate entitlement to the funds attributable to the Jackson Street Towers partnership currently deposited with the Court.

Rule 67(b) provides that "[m]oney paid into court under this rule must be deposited and withdrawn in accordance with 28 U.S.C. §§ 2041 and 2042 and any like statute. The money must be deposited in an interest-bearing account or invested in a court-approved, interest-bearing instrument." Fed. R. Civ. P. 67(b). In turn, 28 U.S.C. § 2042, which is the applicable statute addressing withdrawal, provides as follows:

> No money deposited under section 2041 of this title shall be withdrawn except by order of court.
>
> In every case in which the right to withdraw money deposited in court under section 2041 has been adjudicated or is not in dispute and such money has remained so deposited for at least five years unclaimed by the person entitled thereto, such court shall cause such money to be deposited in the Treasury in the name and to the credit of the United States. Any claimant entitled to any such money may, on petition to the court and upon notice to the United States attorney and full proof of the right thereto, obtain an order directing payment to him.

28 U.S.C. § 2042. Thus, under this statute, "funds deposited into court are subject to court orders and will be paid out when the proper recipients and amounts are determined." *Limbright v. Hofmeister*, 2012 U.S. Dist. LEXIS 157465, at *5-6 (E.D. Ky. Nov. 2, 2012).

It is important to denote that the question of who is entitled to the Blevins's share of funds which came about from the sale of the Jackson Street property is not before the Court. Rather, the sole question contemplated by this motion is whether Blevins-Clark is entitled to a portion of the funds currently deposited with the Court at the present stage of the litigation. Ultimately, at this time, there are no longer remaining questions as to who the proper recipients are of the deposited funds, and in what proportion. As already stated, *ad nauseum*, NIDC is entitled to the funds attributable to the former Blevins and Baldwin shares in the four "Kentucky Partnerships" at the center of this case. Funds derived from the sale of a fifth property, Jackson Street Towers, likewise attributable to Blevins's share in this fifth partnership, were also deposited with the Court. Blevins-Clark and NDCRI,

the relevant parties, agree that Blevins-Clark is entitled to these funds, and the parties have agreed on the amount of $5,255.00. With the question of the proper interpretation of the partnership Agreements out of the way, it is abundantly clear that Blevins-Clark is entitled to this amount while NIDC is entitled to the balance remaining on deposit with the Court, plus an additional amount yet to be determined.

Thus, while NIDC is correct that the specific amount of damages is not yet determinable, the entitlement to the funds presently deposited is clear. Nor is the status of any potential settlement agreement between all parties to this litigation of any consequence. While such an agreement may be preferable, it is certainly not a prerequisite to the withdrawal and disposition of a portion of these funds. NIDC does not, and cannot, make any claim of ownership to the funds derived from the sale of the Jackson Street Towers property. And NIDC has not pointed to any statute or case law which would otherwise give it the ability to further delay the disbursement of funds to which it bears no claim of entitlement. Therefore, the Court agrees with the Plaintiff and NDCRI that Blevins-Clark is presently entitled to the $5,255.00 from the sale of the Jackson Street Towers property. NIDC is entitled to the remainder of the funds deposited with the Court, plus an additional amount which cannot readily be ascertained at this time. Blevins-Clark's Motion for Disbursement will be granted.

**2**

NIDC and Malvern also separately request that this Court order NDCRI to deposit additional funds with the Court during the remaining pendency of this case. In some respects, the foregoing shifts the foundation of much of the motion for preliminary injunction. For example, the motion is premised on the argument that the Court may find that NIDC is entitled to the disputed partnership funds for both the Blevins and Baldwin share, and the Court has, in fact, made such a finding. Yet, this does not necessarily moot

the entirety of the preliminary injunction motion because certain aspects of the case, specifically the question of NDCRI's entitlement to indemnification for its legal fees, survive summary judgment. Thus, a final judgment will not issue following this opinion and order. However, the Courts ruling here undermines certain essential elements of the preliminary injunction analysis on the merits. Consequently, the Court will deny the motion for a preliminary injunction.

To secure a preliminary injunction, "a plaintiff must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). Because such a remedy "is never awarded as of right, the plaintiff must make a clear showing that these factors favor him." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (quoting *Starbucks*, 602 U.S. at 345). No one factor is dispositive, as "each of these factors should be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

The Federal Rules of Civil Procedure direct that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Sixth Circuit interprets this requirement "to imply a hearing in which the defendant is given a fair opportunity to oppose the application and prepare for such opposition." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007). The Sixth Circuit, however, only requires a hearing "when there are disputed factual issues, and not when the issues are primarily questions of law." *Id.* (citing *Lexington-Fayette Urban County Gov't v. BellSouth Telecomm., Inc.*, 14 F. App'x 636, 639 (6th Cir.

2001)). The Sixth Circuit adopted the rule first announced by the Eleventh Circuit, holding that:

> Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held. However, where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.

*Id*. at 553 (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998)). Here, at this juncture, there are no material facts in dispute, at least insofar as the preliminary injunction motion is concerned, and therefore the Court determines that an evidentiary hearing is unnecessary.

The first factor – the likelihood of success on the merits – is substantially altered by the foregoing. Of course, in its motion, NIDC premised its argument on its likelihood to demonstrate entitlement to the disputed funds, along with other violations of the Agreements by NDCRI, and essentially incorporated arguments presented by the motion for summary judgment by cross-reference. As already made clear, NIDC succeeded on the merits of several of its key arguments, while on other more tangential issues, such as the continued holdbacks, NDCRI was entitled to summary judgment. With respect to the remaining claim, whether NDCRI was entitled to holdbacks for its legal fees in this case, the Court is unconvinced that NIDC is likely to succeed on the merits, given the burden of proof before them. At any rate, because NIDC has largely succeeded on the merits, and only a small portion of this case will proceed beyond summary judgment, the Court finds that this factor weighs in favor of granting the preliminary injunction.

The remaining factors, however, weigh more heavily against issuing a preliminary injunction at this time. The second factor – whether NIDC would suffer irreparable harm if the preliminary injunction were denied – is particularly instructive at present.

"Irreparable harm is an 'indispensable' requirement for a preliminary injunction, and 'even the strongest showing' on the other factors cannot justify a preliminary injunction if there is no 'imminent and irreparable injury.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019)). "To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Sumner Cnty. Schs*, 942 F.3d at 327 (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). It is also "well settled that a plaintiff does not suffer irreparable injury if fully compensable by money damages." *Overstreet v. Lexington-Fayette Urban Cnty. Gov.*, 205 F.3d 556, 578 (6th Cir. 2002).

Here, NIDC's success on its corporate veil piercing motion essentially proves fatal to any irreparable harm it might have otherwise been able to demonstrate. NIDC posits that "[i]njunctions are appropriate where there is evidence that the defendant is dissipating funds in such a way that may frustrate a claimant's ability to collect on a judgment." [R. 204 at 6.] NIDC claims, therefore, that NDCRI will simply squander the funds to which NIDC is entitled during the continued pendency of this case and will, ultimately, be unable to effectuate a judgment. This harm is crippled, however, by the success of NIDC's attempt to pierce the Beacon Defendants' corporate veil. Veil piercing presents NIDC with the ability to recover beyond the funds available only to NDCRI, and presents additional avenues of recovery. Consequently, at this juncture, it appears that the Beacon Defendants collectively will be able to satisfy any judgment in this matter, which undermines the existence of any irreparable harm. This proves fatal to NIDC's motion.

While the absence of any irreparable harm is fatal to the motion, the Court will briefly address the remaining elements. As NDCRI points out, a preliminary injunction of this nature could substantially harm others, specifically various other partners who are not

parties to this case. [R. 216 at 10-12.] NIDC urges that "the Kentucky Partnerships do not require the funds" because, having sold the complexes, "they have no remaining purpose other than to be wound up." [R. 204 at 8.] This may be true, but a preliminary injunction requiring the deposit of certain additional funds from the partnership coffers with the Court would likely impair this winding up process. As NDCRI points out, "the remaining funds [in the partnership accounts] do not belong solely to these two parties." [R. 216 at 11.] NDCRI further provides that "[t]o the contrary, any reserves held back by NDCRI to manage the partnerships must, upon dissolution, be distributed among all partners, including non-parties, in accordance with the Partnership Agreements." [*Id.*] In this respect, then, placing certain funds outside of the partnership accounts with the Court would likely inhibit, rather than facilitate, the winding up process. Consequently, this favor too weighs against granting a preliminary injunction.

Fourth, and finally, NIDC has not demonstrated that granting a preliminary injunction under these circumstances is in the public interest. NIDC provides that individuals in the Commonwealth who operate their businesses through partnership are bolstered by a preliminary injunction in this matter because "[s]uch partners need to have faith that mechanisms exist to protect partnership assets from misuse, or at least potential misuse, while those disputes play out in the courts." [R. 204 at 8-9.] The converse is also true, however. Individuals who operate partnerships should also be reassured that Court intervention will not inhibit their ability to wind up partnership affairs once its purpose has effectively terminated. Therefore, this element is generally neutral as to whether a preliminary injunction should be entered.

Accordingly, the Court finds that a preliminary injunction should not be entered at this time, due to the absence of a risk of irreparable harm. Not only is that risk mitigated by the Court's ruling on NIDC" s request to pierce the corporate veil, but it is also fully

compensable by monetary damages. This alone proves fatal to the preliminary injunction inquiry. Thus, NIDC's separate motion for injunctive relief is denied.

**IV**

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Plaintiff Laura Blevins-Clark's Motion for Summary Judgment **[R. 178]** is **DENIED**;
2. Defendant/Crossclaim Plaintiff NIDC and Malvern's Motion for Summary Judgment **[R. 191]** is **GRANTED in part** and **DENIED in part**
3. Defendant NDC Realty Investments LLC's ("NDCRI") Motion for Summary Judgment **[R. 193]** is **GRANTED in part** and **DENIED in part;**
4. Defendant Keystone Values LLC and Beacon Communities LLC's Motion for Summary Judgment **[R. 194]** is **DENIED**;
5. Defendant Beacon Companies, Inc. and NDCREM's Motion for Summary Judgment **[R. 195]** is **GRANTED**;
6. Defendant/Crossclaim Plaintiff NIDC and Malvern's Motion to Strike **[R. 217]** is **DENIED**;
7. Plaintiff Blevins-Clark's Motion to Disburse Court-Controlled Funds, pursuant to Fed. R. Civ. P. 67(b) **[R. 187]** is **GRANTED**;
8. Defendant/Crossclaim Plaintiff NIDC and Malvern's Motion for Injunctive Relief **[R. 204]** is **DENIED AS MOOT**.

This 14th day of October 2026

Karen K. Caldwell

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY